**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANDREA MUDIE**, <br><br> Plaintiff, <br><br> *v.* <br><br> **PHILADELPHIA COLLEGE OF OSTEOPATHIC MEDICINE, et al.**, <br><br> Defendants. | **CIVIL ACTION** <br><br> **NO. 21-2156-KSM** |

**MEMORANDUM**

MARSTON, J.                                             December 29, 2021

Plaintiff Andrea Mudie sues her former employer, Defendant Philadelphia College of Osteopathic Medicine ("PCOM"), and two PCOM employees, Charles Pascall[1] (Office Manager) and Christina Mazella (Chief Human Resources Officer), (collectively "Defendants"), for discrimination based on her race and national origin under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"). (Doc. No. 14.)  Defendants filed a motion to dismiss. (Doc. No. 20.)  Mudie opposes the motion.[2]  (Doc. No. 22.)  For the reasons discussed below, the Court grants in part and denies in part the motion.

## I.   Factual Background

Accepting all of Plaintiff's allegations as true, the relevant facts are as follows.

---

[1] Pascale was identified in Mudie's complaint as "Pascall" (*see* Doc. No. 14 at ¶ 3), and the parties have not filed a stipulation to amend the caption.  Further, although Defendants have identified the correct spelling as "Pascale" in their motion to dismiss (*see* Doc. No. 20 at p. 5), Mudie continues to refer to the manager as "Pascall" in her response (*see* Doc. No. 22).

[2] Plaintiff's counsel is advised that in the future, briefs filed before this Court must include an actual statement of facts; allegations should not be copied and pasted directly from the complaint.

Mudie is African American and emigrated to the United States from Trinidad; she speaks with an accent.  (Doc. No. 14 at ¶¶ 1, 11.)

Mudie worked as a registered nurse at PCOM's Family Medicine Healthcare Center.  (*Id.* at ¶ 1.)  Pascale, who is Caucasian, supervised Mudie.  (*Id.* at ¶ 12.)  Mudie alleges that Pascale discriminated against her by refusing to allow her to take time to eat lunch, frequently telling her that he could replace her at any time, and calling her a "liar" when she asked to take a day off work because she was closing on a new house.  (*Id.* at ¶ 15(d), (e), (h).)  In addition, Pascale "constantly" told Mudie that she did not understand English well and did not understand the "American way."  (*Id.* at ¶ 15(a).)  Likewise, Pascale instructed Mudie not to speak in meetings because she did not understand the "American way."  (*Id.* at ¶ 15(b).)  Pascale also advised Mudie that she needed "to go out and learn about America because she knows nothing about it."  (*Id.* at ¶ 15(c).)  And, when Mudie was in the process of applying for United States citizenship, to the extent she needed time off to complete the process, Pascale required Mudie to show him documentation first.  (*Id.* at ¶ 15(f).)

Further, Pascale told Mudie that "Donald Trump should build a wall for *all* outsiders [who] do not belong in the United States," above and beyond a wall on the Mexico border.  (*Id.* at ¶ 15(g) (emphasis added).)  Mudie complained to Human Resources ("HR") about Pascale's comment; however, "nothing was done" in response.  (*Id.* at ¶ 19.)  Last, Mudie alleges that Pascale, along with her other managers, wrongly accused her of stealing patient co-pays and office supplies.  (*Id.* at ¶ 16(b).)  Mudie "felt like she was being set up" and reported this conduct to Mazella in HR, maintaining that the accusations were "untrue."  (*Id.*)  According to Mudie, Defendants did not take any action with respect to these accusations.

Mudie also claims that other PCOM employees, including her coworkers, discriminated

against her.  (*See id.* at ¶ 16.)  For example, Mudie alleges that Mazella and an individual named Peg[3] repeatedly threatened her with termination in 2019 and 2020.  (*Id.* at ¶ 16(d).)  Specifically, Mazella and Peg demanded that Mudie report to HR each week, and they would tell her that they were auditing her and threatened her with termination to the extent the audit revealed any wrongdoing.  (*Id.*)  And Mudie claims that in 2020, one of her co-workers, Angela Solomon, told Mudie that she did not want to work with "islanders."  (*Id.* at ¶ 16(a).)  Mudie reported Solomon's statement to Mazella; she is not aware of Defendants taking any action after receiving this complaint either.  (*Id.*)  Moreover, in August 2020, PCOM's Director of Operations, Steven Castello, transferred Mudie to a different PCOM facility, which was located in a "dangerous neighborhood" that made Mudie feel unsafe.  (*Id.* at ¶ 16(c).)  Mudie complained about the transfer to her supervisor, Tiffany Floyd, and to Mazella; however, "these complaints never went anywhere."  (*Id.*)  According to Mudie, her coworkers also told her that she would be fired because of her repeated complaints to HR.  (*Id.* at ¶ 20.)

Mudie also alleges that she received two threats "against her life" while working for Defendants that PCOM never properly investigated or resolved.  (*See id.* at ¶ 17.)  First, in 2019, Mudie received a letter via interoffice mail, stating, "You should have never told on us.  You will pay.  You might escape this time but next time you won't."  (*Id.* at ¶ 17(a); Doc. No. 14-2.)  The police were called, and an investigation was opened.  (Doc. No. 14 at ¶ 17(a).)  But the person responsible for sending the letter was never identified.  (*Id.*)  The following year, in November or December 2020, Mudie received a letter stating:  "It's Halloween, watch what you eat, drink and be scary!  Told you we would get you.  This is only the beginning, your best bet is to resign or

---

[3] Mudie does not know Peg's last name, nor does Mudie plead what Peg's position is within the HR department.

lose your career.  Your choice."  (*Id.* at ¶ 17(b); Doc. No. 14-3.)  Mudie reported this to PCOM's management, but management failed to investigate.  (Doc. No. 14 at ¶ 17(b).)

On January 2, 2021, PCOM terminated Mudie for allegedly making unauthorized phone calls to Trinidad using PCOM's landlines during work.  (*Id.* at ¶¶ 22–23.)  Mudie asserts that Mazella and Dr. Wayne Westerberg had actually given her permission to use PCOM's landlines and the code to make calls outside of the United States so that she could contact her family in Trinidad because of a difficult and tragic family situation—namely, her sister, who lived in Trinidad, suffered from COVID-19 and ultimately passed away from the virus—and that Defendants' reason for terminating her was therefore pretextual.  (*Id.* at ¶ 23.)

## II.    Procedural History

Mudie filed an initial Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") prior to her termination[4] and received a right-to-sue letter from the EEOC on March 16, 2020.  (Doc. No. 20-1 at pp. 2–4, Ex. 1).

Then, after her termination, on August 3, 2021, Mudie filed another Charge of Discrimination with the EEOC.  (Doc. No. 20-1 at pp. 6–7, Ex. 2.)  In that charge, she alleged that the discrimination took place from 2018 through January 1, 2021 and checked the boxes for discrimination based on "race," "color," "national origin," and "retaliation."  (*Id.*)  Mudie received a right-to-sue letter from the EEOC on August 5, 2021.  (Doc. No. 14-1.)

Mudie initially filed this action on May 11, 2021.  (Doc. No. 1).  She then filed a first amended complaint on July 21, 2021 (Doc. No. 7) and a second amended complaint on August

---

[4] Plaintiff has not provided the Court a copy of this first Charge.  It would have been helpful to the Court to have the initial Charge to see if Plaintiff alleged national origin discrimination or race discrimination at that point in time and what her specific allegations were.  To the extent Plaintiff files a third amended complaint, Plaintiff is directed to include her first charge as an exhibit.

10, 2021 (Doc. No. 14).  In her second amended complaint, Mudie raises three counts for

unlawful harassment, discrimination, retaliation, and hostile work environment based on her

ethnicity/national origin and race under 42 U.S.C. § 1981 (Count I); Title VII, 42 U.S.C.

§ 2000e-2 (Count II); and the Pennsylvania Human Relations Act ("PHRA") (Count III).  (*Id.*)

Shortly thereafter, Mudie filed a stipulation in which she agreed to withdraw Count III, the

PHRA cause of action.  (Doc. No. 19.)

Defendants move to dismiss the remaining two counts, contending that (1) Mudie cannot

state a claim for race discrimination under § 1981 because her factual allegations all pertain to

discrimination on the basis of her national origin and *not* her race, and (2) Mudie's Title VII

claim is untimely.  (Doc. No. 20.)  In support of its motion, PCOM relies on Mudie's 2021

EEOC charge form.  (Doc. No. 20-1.)  Mudie opposes the motion.  (Doc. No.

## III.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  *Id.*  "Factual allegations must be enough to raise a right to relief above the

speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

When reviewing a motion to dismiss, courts "must accept the allegations in the complaint

as true, but are not compelled to accept unsupported conclusions and unwarranted inferences, or

a legal conclusion couched as a factual allegation."  *Castleberry v. STI Grp.*, 863 F.3d 259, 263

5

(3d Cir. 2017) (quotation marks omitted).  "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  "However an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (quotation marks omitted and alterations accepted).  The court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (quotation marks omitted).

Because Mudie's EEOC charge is a matter of public record and integral to her claims, we consider it in deciding this motion to dismiss.  *See Savage v. Temple Univ. – of Commonwealth Sys. of Higher Educ.*, Civil Action No. 19-6026, 2020 WL 3469039, at *2 (E.D. Pa. June 25, 2020) ("Because Savage's EEOC charge is a matter of public record and integral to his discrimination claims, we consider it in deciding the motion to dismiss."); *Braddock v. SEPTA*, No. 13-6171, 2014 WL 6698306, at *7 (E.D. Pa. Nov. 25, 2014) ("I may properly consider EEOC filings in the context of a motion to dismiss for failure to exhaust administrative remedies without converting the motion into one for summary judgment.").

IV.   **Discussion**

   A.  *§ 1981 Claim*

In Count I, Mudie asserts a § 1981 claim, alleging that Defendants discriminated against her due to her "race and ethnicity."  (Doc. No. 14 at pp. 6–7.)  Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every state and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed

6

> by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.  Although § 1981 does not explicitly refer to "race," the Supreme Court "has construed the section to forbid all 'racial' discrimination in the making of" private and public contracts.  *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987).  "To state a claim under § 1981, a party must allege facts sufficient to show: (1) [she] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts."  *Gross v. R.T. Reynolds, Inc.*, 487 F. App'x 711, 716 (3d Cir. 2012); *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001); *see also See Hood v. N.J. Dep't of Civil Serv.*, 680 F.2d 955, 959 (3d Cir. 1982) (explaining that "intentional discrimination is a required element of a § 1981 claim").

Defendants argue that Mudie has not plausibly alleged that they discriminated against her on the basis for her *race* for two reasons:  first, as a general matter, in many of her allegations, Mudie fails to tie her assertions of Defendants' allegedly discriminatory actions to her *race*; and second, the remainder of Mudie's allegations relate to *national origin* discrimination (i.e., the fact that she was born in Trinidad), not *race* discrimination.  (Doc. No. 20.)  We address each contention in turn.

First, the Court agrees with Defendants that several of Mudie's allegations are entirely untethered from her race and therefore do not support a § 1981 claim.  For instance, Mudie alleges that Pascale discriminated against her in May 2019, when she asked for the day off because she was closing on a new house and, in response, he called her a "liar" and required her to "show him an email from her lender to prove she was actually purchasing a home."  (Doc. No. 14 at ¶ 15(d).)  But she does not allege any facts from which the court can reasonably infer that

7

Pascale did so because of her race, rather than because of some other reason.  Likewise, Mudie

claims that Pascale discriminated against her when he "refus[ed] to give Plaintiff time for lunch"

and when he told her that "he could replace her at any time."  (*Id.* at ¶ 15(e), (h).)  Again, Mudie

fails to provide any facts from which we can infer that Pascale denied her lunch breaks or

threatened to replace her because of her *race*.  In that same vein, Mudie alleges that in 2020,

Pascale and her other managers "wrongly accused" her of stealing patient co-pays and office

supplies; that in 2019 and 2020, Mazella repeatedly informed Mudie that she was being audited

and threatened her with termination; and that she was transferred to another PCOM location "in a

more dangerous neighborhood" and Mazella failed to investigate her complaint regarding the

transfer.  (*Id.* at ¶ 16(b)–(d).)  Yet again, Mudie fails to provide facts to show that Defendants'

actions were related to her race, as opposed to some other reason or due to a personality

conflict.[5]

       Mudie summarily labels Pascale's and her other co-workers' conduct in these instances

as "discriminatory" (*see* Doc. No. 14 at ¶¶ 15–16), but such allegations are conclusory since she

fails to allege facts to show that his actions were somehow connected to any protected category,

let alone her race.[6]  *See, e.g.*, *Gross*, 487 F. App'x at 716 ("[W]e conclude that [the plaintiff] has

failed to allege a plausible claim of intentional discrimination on the basis of race . . . under

§ 1981.  While the Amended Complaint alleges an abundance of wrongdoing by [the defendant]

---

[5] And although the threats that Mudie received in the workplace are certainly abhorrent (*see* Doc. No. 14 at ¶ 17(a)–(b)), Mudie likewise fails to plausibly allege that the threats were somehow race-related.

[6] Notably, Defendants pointed out several of these examples in their motion to dismiss and noted how the allegations were not connected to the plaintiff's race.  (*See* Doc. No. 20 at pp. 10–11.)  Mudie does not address this in her response brief; rather, she solely focuses on the allegations concerning her "African accent," the fact that she is from Trinidad, that she was fired for making calls to Trinidad, and that one of her co-workers said she did not want to work with "islanders."  (*See* Doc. No. 22 at p. 12.)

and its employees, it fails to allege any facts supporting the conclusion that those acts were motivated by discrimination on the basis of race.  Instead, it alleges a series of unfortunate events and then states, in conclusory fashion, that the reason for those events is that [the defendant] harbored discriminatory animus towards [the plaintiff].”); *Powers v. Se. Pa. Trans. Auth.*, Civil Action No. 19-4695, 2021 WL 2577171, at *7 (E.D. Pa. June 23, 2021) (“Much of the alleged behavior that Plaintiff attributes to Defendants, particularly Defendant Waddell, is certainly unprofessional and offensive but does not plausibly alleged discriminatory intent. . . . For instance, Plaintiff’s allegations that Defendant Waddell frequently made loud noises when trying to speak to co-workers, threw papers on him, and made physical contact by bumping into him, although inappropriate workplace behavior, does not plausibly plead discrimination or a hostile work environment based on a protected category.”); *Wright v. Providence Care Ctr., LLC*, Civil Action No. 17-747, 2017 WL 6059679, at *7 (W.D. Pa. Dec. 7, 2017) (“The Court will accept as true that Lutz assigned [the plaintiff] to assist in a less-desirable unit . . . , rejected her request that raw bananas not be served to patients, never granted her request for an accommodation regarding the bananas, and involuntarily assigned her to another unit. . . .  [But the plaintiff] fails to plead plausible claims under any race discrimination theory.  There are simply no facts pled to support an inference that [the plaintiff] was mistreated because of her race. . . .  [The plaintiff’s] subjective belief, and bald, conclusory allegation that the alleged mistreatment was due to her race does not satisfy the *Twombly* standard.”).

Here, the only allegations that are race-related are bald legal conclusions and lack factual support.  (*See* Doc. No. 14 at ¶ 10 (“Defendants have created a prejudiced, hostile and bigoted environment toward its African American and/or Trinidadian employees.”), ¶ 14 (“Defendant Pascall treated Plaintiff in a racist and discriminatory manner.”), ¶ 18 (“Due to the actions of

Defendants, Plaintiff was forced to work in a hostile environment and was unjustly treated, because of her race and ethnicity."), ¶ 21 ("Due to the actions of Respondents, Complainant was forced to work in a racist, hostile environment which caused her substantial stress and anxiety.").)  *See, e.g.*, *Perez v. RHP Staffing Co.*, No. 5:21-cv-01314, 2021 WL 4583850, at *8 (E.D. Pa. Oct. 6, 2021) ("The Amended Complaint asserts throughout that Defendants discriminated against [the plaintiff] 'because of her race [and] national origin.'  But these are conclusory statements, and simply repeating it multiple times does not change them into factual allegations."); *see also Castleberry*, 863 F.3d at 263 (explaining that on a motion to dismiss, the court does not "accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation"); *Savage*, 2020 WL 3469039, at *6 ("Savage notes that he 'pled that he was terminated because of his race, religion, and participation in protected activity,' and that 'Defendants discriminated against him on the basis of his religion (Islam) and race (Black.)'  But those are legal conclusions, not factual allegations, and we do not consider them in deciding a motion to dismiss.").

Mudie alleges that she is African American and Pascale is Caucasian, but this, standing alone, is insufficient to state a § 1981 claim.  *See, e.g.*, *Perez*, 2021 WL 4583850, at *8 ("[The plaintiff] fails to allege any facts that these discriminatory acts were because of her race. . . . [T]he mere fact that [the plaintiff's] supervisors were Caucasian, without more, is not enough to establish that an adverse action was based on her race."); *Oliver v. Clinical Practices of Univ. of Pa.*, 921 F. Supp. 2d 434, 455 (E.D. Pa. 2013) (dismissing race-based harassment claim where the plaintiff alleged that she was reprimanded for eating at her desk or coming in late unlike her white coworkers, that one of her coworkers accessed her medical records and history without her authorization, and that the human resources department failed to investigate the conduct, because

the plaintiff had not "presented any evidence from which a juror could infer that [the defendants] acted with racial animus, and because the mere fact that those individuals are white is insufficient to demonstrate such intent"); *see also Savage*, 2020 WL 3469039, at *6 (Savage's only allegation related to race is that he is a 'Black male Muslim.' . . . [O]n its own, [this] does not show that Temple intended to discriminate against him because of his race.").

Second, the Court turns to Defendants' argument that the remainder of Mudie's allegations relate to a claim of *national origin* discrimination, not *racial* discrimination, and therefore do not support a § 1981 claim.

The Supreme Court has explained that § 1981 "protect[s] from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics"; "[s]uch discrimination is racial discrimination that Congress intended § 1981 to forbid." *St. Francis Coll.*, 481 U.S. at 613. However, § 1981 does not cover national origin discrimination. *See, e.g.*, *id.* at 613 ("If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin . . . , he will have made out a case under § 1981."); *Abdul v. Gamesa Tech. Corp., Inc.*, Civil Action No. 11-1946, 2012 WL 1344391, at *2 (E.D. Pa. Apr. 18, 2012) ("Courts in this District have repeatedly dismissed claims that are based: 1) solely on national origin, or 2) on national origin and other non-protected characteristics, while permitting claims based on national origin *and* race, ethnicity, or ancestry to proceed." (collecting cases)); *Jimmy v. Elwyn, Inc.*, Civil Action No. 11-7858, 2014 WL 630605, at *9 (E.D. Pa. Feb. 18, 2014) (same). "Therefore, Plaintiff must prove that [s]he was subject to discrimination based on the fact that [s]he was born into a particular ancestral or ethnic group rather than the mere fact that [s]he was born [a Trinidadian]." *Kamara v. Horizon House, Inc.*,

Civil Action No. 13-6728, 2015 WL 9260031, at *5 (E.D. Pa. Dec. 18, 2015).

Although it is true that "the line between discrimination based on 'ancestry or ethnic characteristics,' and discrimination based on 'place or nation of origin,' is not a bright one," *see St. Francis Coll.*, 481 U.S. at 614 (Brennan, J., concurring), the Court finds that here, Mudie has not pleaded facts indicating discrimination based on "ancestry or ethnic characteristics"; rather, she merely pleads discrimination based on the fact that she was born in, and emigrated from, Trinidad.

Although decided at the summary judgment stage, *Kamara v. Horizon House, Inc.* is instructive here.  In that case, the plaintiff alleged that he was "subjected to blatantly discriminatory comments about his accent and about the fact that he was born in Africa," such as "Africans are lazy; all you Africans do is complain; Africans, they don't like to do any work." 2015 WL 9260031, at *5.  The court dismissed the plaintiff's § 1981 claim, holding that he could not pursue a claim of racial discrimination based on his accent.  *Id.* The court reasoned, "Plaintiff's accent is a result of being born outside the United States, not a result of his ethnic or ancestral origins, and therefore is insufficient to maintain a claim of racial discrimination under Section 1981."  *Id.*; *see also Senador v. Zober Indus., Inc.*, Civil Action No. 07-4144, 2009 WL 1152168, at *9 (E.D. Pa. Apr. 28, 2009) ("Plaintiff presented evidence that Philipose referred to Filipinos as stupid, lazy and without brains. . . .  Plaintiff testified that Philipose made fun of his accent . . .  This evidence refers solely to discrimination against his national origin as Filipino and not as to his race.  Plaintiff fails to present any evidence of harassment based on his race and I will therefore dismiss his claims for hostile work environment based on his race."); *Obimah v. Am. Red Cross*, 3:18-CV-00181, 2018 WL 3715759, at *2–3 (W.D.N.C. Aug. 3, 2018) (finding that the plaintiff's complaint pled national origin discrimination, not racial discrimination, where

the plaintiff alleged that her accent was mocked, she was told "she had better go back to Africa," and her coworkers made comments regarding "Nigerian scammers" and "Nigerian crooks," and noting that "mocking a person's accent has repeatedly been found to constitute national origin discrimination"); *Quraishi v. Kaiser Found. Health Plan of the Mid-Atlantic States, Inc.*, Civil No. CCB-13-10, 2013 WL 2370449, at *2 (D. Md. May 30, 2013) (granting motion to dismiss § 1981 claim where the plaintiff alleged that her two managers mimicked her accent, finding that such evidence was indicative of national origin discrimination, not race discrimination); *Ramos v. Carolina Motor Club, Inc.*, 3:17-cv-00212-RJC, 2018 WL 3040028, at *10 (W.D.N.C. June 19, 2018) ("The comments made to Plaintiff concerned her accent, which Courts have consistently found as discriminatory toward one's national origin, not race.").

Here, Mudie alleges that Pascale made derogatory comments about her grasp of the English language and her speech; in doing so, Mudie alleges, at least implicitly, that Pascale discriminated against her because of her accent.  (*See, e.g.*, Doc. No. 14 at ¶ 11 ("Plaintiff speaks with an accent."), ¶ 15(a) ("Pascall would constantly tell Plaintiff she does not understand English well and that [she] does not understand the 'American way.'"), ¶ 15(b) ("He would tell Plaintiff he did not want her to speak in meetings because she did [not] understand the 'American way.'").)  But, as in *Kamara*, Mudie's accent is a result of being born outside of the United States, and she does not plead that it is a characteristic of her ethnicity or ancestry; indeed, Mudie's own complaint makes this clear, as she emphasizes that Pascale felt that she did not understand the "*American way*."  (*See id.* at ¶ 15(a)–(b) (emphasis added).)

In addition, Mudie alleges that:  Pascale "told her that she needs to go out and learn about America because she knows nothing about it" (*id.* at ¶ 15(c)); Pascale said that a wall should be built to keep all "outsiders" out of the United States (*id.* at ¶ 15(f)); Pascale asked for proof when

Mudie was applying for her American citizenship (*id.* at ¶ 15(g)); and one of her coworkers stated that she did not want to work with "islanders" like Mudie (*id.* at ¶ 16(a)).  All of these discriminatory comments target Mudie for being born outside of the United States, in Trinidad, and not because of any ethnic or ancestral characteristic.  Thus, these allegations do not support a claim for racial discrimination under § 1981.  *See Jimmy*, 2014 WL 630605, at *9 ("[The plaintiff] provides evidence of disparaging comments and other actions based solely on animus toward those of African origin.  [The plaintiff] asks the Court to infer that a national origin claim brought by a person of African origin incorporates a racial component, yet does not point to any evidence in the record that this is the case.")

   *Kamara* is illustrative on this point as well.  There, the plaintiff claimed that he was subjected to discriminatory comments "about the fact that he was born in Africa," such as "Africans are lazy; all you Africans do is complain; Africans, they don't like to do any work." 2015 WL 9260031, at *5.  The court held that this also was insufficient to support a racial discrimination claim under § 1981.  *Id.* ("Plaintiff's claim that he was subject to discrimination on the basis that he was born in Africa and that discriminatory comments were made about persons from Africa is likewise insufficient.  This is precisely the type of claim that cannot be brought under Section 1981, a claim based on birthplace alone."); *see also Jimmy*, 2014 WL 630605, at *6, *9 (dismissing § 1981 claim at summary judgment because the plaintiff failed to provide evidence supporting a race discrimination claim and rather only provided evidence supporting a national origin claim where the plaintiff testified that his supervisors told the staff that "Africans were only in the country to take Americans' jobs, that Africans came to America to 'find out how to dress,' and that Africans had tails and lived in trees"); *Funayama v. Nichia Am. Corp.*, Civil Action No. 08-5599, 2009 WL 1437656, at *1–2, *4–5 (E.D. Pa. May 21,

2009) (granting motion to dismiss § 1981 claim where the plaintiff, a Japanese woman, alleged that her supervisor said that he and another executive "did not want any Japanese in the Detroit Accounting Department" and told her it was "hideous that [she] was becoming Americanized" when he learned that her husband was Caucasian, finding that the plaintiff's discrimination claim was based on national origin, not race).[7]

Ultimately, taking Mudie's allegations as true, Mudie has pled a claim for *national origin* discrimination, not race discrimination. Mudie does not show that Defendants intended to discriminate against her because of her race. *Contra Castleberry*, 863 F.3d at 266 (finding that the plaintiffs alleged facts tending to show an intent to discriminate on the basis of race where they alleged that "they were the only black males assigned to their specific site, they were assigned undesirable duties, they were the targets of racial epithets, and they were fired twice due to their race").

Because Mudie has alleged no facts that give rise to the inference that Defendants discriminated against her on the basis of race, she has not stated a claim for race discrimination under § 1981. Such dismissal is without prejudice and with leave to amend.

### B.  Title VII Claim

In Count II, Mudie asserts a Title VII claim for harassment, discrimination, retaliation, and hostile work environment "on the basis of ethnicity/national originty [sic] and race." (Doc.

---

[7] Mudie relies on *Wesley v. Palace Rehabilitation & Care Center, LLC*, 3 F. Supp. 3d 221 (D.N.J. 2014) and *Chandoke v. Anheuser-Busch, Inc.*, 843 F. Supp. 16 (D.N.J. 1994) to support her contention that she has stated a claim for racial discrimination. But those cases involved different sets of facts and are distinguishable from the instant matter. *See Wesley*, 3 F. Supp. 3d at 233 ("The *context* of Defendants' alleged statements regarding Plaintiff's communication skills—*that they told her they wanted a nurse of a different race and then replaced her with nurses from that race*—permits an inference that the statements were motivated by racial, rather than national origin animus." (emphasis added)); *Chandoke*, 843 F. Supp. at 20 (finding material issues of fact as to whether the potential employer, who the plaintiff had interviewed with over the phone, even "knew that [the plaintiff] was from India").

No. 14 at p. 7.)  Defendants argue that Count II must be dismissed as untimely because she did

not file suit within 90 days of receiving her first right-to-sue letter from the EEOC and her

second Charge of Discrimination recounts incidents that are time-barred.  (Doc. No. 20 at

pp. 14–16.)

       "To bring suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must

first file a complaint with the EEOC within 300 days of the alleged unlawful employment

practice."  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (citing 42

U.S.C. § 2000e-5(e)(1)).  The continuing violation doctrine provides a limited exception to this

requirement.  *See Campelese v. Morgan Stanley Smith Barney*, *LLC*, No. 1:15-cv-00784, 2017

WL 2264349, at *4 (M.D. Pa. May 24, 2017) ("The continuing violation doctrine is an 'equitable

exception' to the aforementioned [300-day] filing requirement."); *McRoy v. Mercer Cnty. Bd. of*

*Social Servs.*, Civil Action No. 11-0202 (PGS)(TJB), 2014 WL 2094110, at *8 (D.N.J. May 20,

2014) (same).  Under that doctrine, "when a defendant's conduct is part of a continuing practice,

an action is timely so long as the last act evidencing the continuing practice falls within the

limitations period; in such an instance, the court will grant relief for the earlier related acts that

would otherwise be time barred."  *Napier v. County of Snyder*, 833 F. Supp. 2d 421, 427 (M.D.

Pa. 2011); *see also Mandel*, 706 F.3d at 165 ("Under the continuing violation doctrine,

discriminatory acts that are not individually actionable may be aggregated to make out a hostile

work environment claim; such acts 'can occur at any time so long as they are linked in a pattern

of actions which continues into the applicable limitations period'" (quoting *O'Connor v. City of*

*Newark*, 440 F.3d 125, 127 (3d Cir. 2006)).  "To allege a continuing violation, the plaintiff must

show that all acts which constitute the claim are part of the same unlawful employment practice

and that at least one act falls within the applicable limitations period."  *Mandel*, 706 F.3d at 165–

66.

However, discrete discriminatory acts are not actionable it they are time-barred—i.e., if they occurred more than 300 days before the plaintiff files her charge of discrimination; this is so even if those discrete acts are related to other discriminatory acts that are timely alleged in the charge. *See McRoy*, 2014 WL 2094110, at *8 ("In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), the Supreme Court limited the applicability of the continuing violation doctrine, holding that 'discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges.' That is because '[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act.'"); *see also Mandel*, 706 F.3d at 165; *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) ("*Morgan* established a bright-line distinction between discrete acts, which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim. The former must be raised within the applicable limitations period or they will not support a lawsuit. The latter can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period."). Discrete discriminatory acts include termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, and wrongful accusation. *Mandel*, 706 F.3d at 165; *O'Connor*, 440 F.3d at 127; *McRoy*, 2014 WL 2094110, at *8.

A plaintiff must file a complaint in court within 90 days of receiving a right-to-sue letter from the EEOC. *See Rockmore v. Harrisburg Prop. Serv.*, 501 F. App'x 161, 164 (3d Cir. 2012) ("As the District Court properly noted, a civil action under Title VII must be commenced within 90 days of receiving a right-to-sue letter from the EEOC.").

Here, Defendants assert that Mudie filed her first charge with the EEOC in 2019. (Doc.

No. 20.)  Although a copy of that charge has not been provided to the Court, it is clear from the EEOC's March 16, 2020 right-to-sue letter that Mudie had filed her first charge prior to that date. (*See* Doc. No. 20-1, Ex. 1.)  Mudie filed her second charge on August 3, 2021 (Doc. No. 20-1, Ex. 2) and received a right-to-sue notice from the EEOC on August 5, 2021 (Doc. No. 14-1). She filed her second amended complaint on August 10, 2021.  (Doc. No. 14.)

Defendants contend that Mudie's Title VII hostile work environment claim fails because "the Charge itself was not filed within 300 days of most of the conduct she complains about." (Doc. No. 20 at p. 15 ("Although the Charge itself does not contain much in the way of dates . . . , the allegations of the Charge nevertheless can easily and clearly be tied to the allegations of the [second amended complaint] and its predecessors.  And doing so makes clear that the grievances making up Plaintiff's harassment/hostile work environment claim fall well outside the 300-day window within which she was required to go to the EEOC.").)

It is true that Mudie's allegations from 2019 are time-barred, given that nearly 600 days would have passed between December 31, 2019 (the last possible date in 2019) and August 3, 2021, the date Mudie filed her second charge.  However, some of the 2019 allegations do not appear to involve discrete acts (*see* Doc. No. 14 at ¶ 15(d) (describing an act from May 2019, in which Pascale called Mudie a "liar" when she said she needed a day off work to close on a house and made her show proof that she was actually purchasing the house), ¶¶ 16(a) & 19 (describing Mudie's complaint to HR about Pascale's comment that President Trump should build a border wall around October 29, 2019), ¶ 17(a) (describing a threat Mudie received through interoffice mail from an unidentified person that stated "You should have never told on us.  You will pay. You might escape this time but next time you won't")), and accordingly, they may still be considered under the continuing violation doctrine so long as at least one other discriminatory

action occurred within the 300-day filing period.  That said, the remaining allegation is a threat of termination, which constitutes a discrete act, and cannot be considered under the continuing violation doctrine.  (*See* Doc. No. 14 at ¶ 16(a) (alleging that Mudie was "threatened with termination multiple times by Defendant Mazella and Ms. Peg in HR in 2019").)  *See O'Connor*, 440 F.3d at 127 (finding that "it is apparent that nearly all of [the plaintiff's] allegations fall into the category of discrete acts" and thus "cannot be aggregated under a continuing violations theory").

Turning to Mudie's 2020 allegations, any discriminatory act that occurred before October 7, 2020 would also be time-barred, since that date marks 300 days before August 3, 2021, the date Mudie filed her second charge, unless the continuing violations doctrine applies.  Most of Mudie's allegations from 2020 will not support her lawsuit because they occurred before October 7 and are discrete acts that cannot be aggregated under the continuing violations doctrine.  (*See* Doc. No. 14 at ¶ 16(b) ("In or around March 2020, Plaintiff's managers, including Defendant Pascall wrongly accused Plaintiff of stealing patient co-pays and office supplies."), ¶ 16(c) (stating that "[i]n or around August 2020, Director of Operations, Steven Castello, had Plaintiff moved to another PCOM location in a dangerous location in which she did not feel safe," and that Mudie complained about her transfer but her complaints went nowhere, i.e., she was not transferred back to her old location), ¶ 16(d) ("Plaintiff was threatened multiple times by Defendant Mazella and Ms. Peg . . . in HR in 2019 and in 2020.").)  *See O'Connor*, 440 F.3d at 127 (stating that wrongful accusations, threats of termination, and denial of transfer are discrete acts that will not support a lawsuit if raised after the limitations period); *see also id.* at 127 & n.1 (finding that the continuing torts doctrine was inapplicable because the plaintiff's allegations constituted discrete acts, where the plaintiff alleged, among other things, that his employer

"denied him a promotion, failed to expunge his disciplinary record, [and] transferred him to a position under the command of a superior officer who was hostile to him").

Next, the Court considers whether there is any one act that occurred within the statutorily required timed period.  There is.  The parties do not dispute that Mudie was terminated on January 2, 2021—which falls within the 300-day period.  This is sufficient at this stage of the litigation for us to apply the continuing violation doctrine to related, non-discrete discriminatory acts that would otherwise be time-barred.  *See Napier*, 833 F. Supp. 2d at 427 ("Here, the parties do not dispute that plaintiff's constructive discharge occurred within the statutorily required time periods.  As such, at this stage in the litigation [the motion to dismiss stage], the court will allow Plaintiff to submit evidence under the 'continuing violation' doctrine, regarding earlier alleged acts of discrimination which may otherwise be time-barred.").

## V.   Conclusion

For the foregoing reasons, the Court dismisses Mudie's § 1981 claim, without prejudice, but denies Defendants' motion to dismiss Mudie's Title VII claim.

An appropriate Order follows.