**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANDREA MUDIE**, <br><br> Plaintiff, <br><br> *v.* <br><br> **PHILADELPHIA COLLEGE OF OSTEOPATHIC MEDICINE, et al.,** <br><br> Defendants. | **CIVIL ACTION** <br><br><br> **NO. 21-2156-KSM** |

## MEMORANDUM

**Marston, J.**                                                    **May 20, 2022**

Plaintiff Andrea Mudie has sued her former employer, Defendant Philadelphia College of Osteopathic Medicine ("PCOM"), alleging that PCOM discriminated against her because of her national origin.  (Doc. No. 14.)  Mudie asserts hostile work environment, retaliation, and discrimination claims under Title VII of the Civil Rights Act of 1964.  (*Id.*)

PCOM has filed a motion for summary judgment, arguing that Mudie's hostile work environment claim is time-barred and that the continuing violation doctrine does not apply.  (Doc. No. 24.)  PCOM also contends that Mudie cannot establish a retaliation claim based on either her transfer to a different office or her termination, and that her discrimination claim must be dismissed because she cannot show a causal connection between PCOM's decision to terminate her and her national origin nor can she show that PCOM's stated reasons for terminating her were pretextual.  (*Id.*)  Mudie opposes the motion.  (Doc. No. 41.)

For the reasons that follow, the Court grants the motion.

## I.     Factual Background and Procedural History

Viewing the evidence in the light most favorable to Mudie, the relevant facts are as follows.

### A.     Mudie's Background

Mudie is from Trinidad and Tobago and has traveled back and forth between there and the United States since she "was a kid."  (Doc. No. 41-2 ("Mudie Dep.") at 13:14–17.)  She began training as a nurse in Trinidad and Tobago in 2003 and received her certification as a nurse in 2005.  (*Id.* at 13:6–11.)

In 2014, Mudie became a permanent resident of the United States.  (*Id.* at 13:18–20.) Afterwards, Mudie attended the Harris School of Business in Upper Darby, Pennsylvania and became a Certified Medical Assistant.  (*Id.* at 12:22–13:2, 13:21–25.)

### B.     Mudie's Work at PCOM

PCOM is a non-profit health sciences university and provides patient health care services at its main and branch campus facilities and off-campus healthcare centers.  (Doc. No. 41-1 at ¶¶ 1–2.)  PCOM Family Medicine operates from several office locations in Philadelphia, including an office at PCOM's main campus on City Avenue (also referred to as "Suite 100"), a small, one-provider office at the Roxborough Medical Office Building, an office on Cambria Street, and an office on Lancaster Avenue.  (*Id.* at ¶ 3.)  PCOM hired Mudie as a medical assistant in its Family Medicine department in January 2018, and she began work in February 2018 at the City Avenue location. (*Id.* at ¶¶ 4–6; Mudie Dep. at 14:18–21.)

In the summer of 2018, Mudie began reporting to Charles Pascale, Clinical Operations Manager.  (Doc. No. 41-1 at ¶ 8.)  Pascale worked out of PCOM's City Avenue location.  (*Id.* at ¶ 9.)  By this time, Mudie worked primarily out of the Roxborough office, supporting one

provider, Dr. Joan Grzybowski.  (*Id.* at ¶ 11.)  Because Grzybowski only worked three days a week at Roxborough, Mudie initially worked three days a week there and then two days a week at the City Avenue location; later on, she worked three days a week at Roxborough and two days a week from home.  (*Id.* at ¶ 12.)

### C.    *Mudie Experiences Scheduling Issues and Complains to HR*

In May 2019, Pascale changed Mudie's work schedule, effective immediately, while she was on vacation.  (Mudie Dep. at 29:16–31:17.)  Mudie told Pascale that because she is a single mom, her schedule could not change and she could only work certain hours and that she had already made, and been granted, that request when she first took the job.  (*Id.*)  Pascale told Mudie he did not "want to hear about [her] childcare issues" and "need[ed] people who can work [sic] day shift."  (*Id.*)  Mudie complained to Christina Mazella, the Director of Human Resources ("HR"), twice concerning this issue.  (*Id.*; *see also* Doc. No. 41-1 at ¶ 14.)

That same week, Mudie was upset about an encounter she had with Pascale concerning a request for time off to attend the closing on her house.  (Doc. No. 41-1 at ¶ 13; Mudie Dep. at 32:5–34:15.)  Pascale called Mudie a "liar."  (*See* Doc. No. 40, Ex. 10 (showing that Pascale texted Mudie, "You told me yesterday 'might' have been for your house closing.  You lied to me" and that Mudie responded with a screenshot of her closing information and said "I never lied to you  about my home closing"); Mudie Dep. at 32:14–21 (testifying that after Pascale sent her a text message calling her a liar, she spoke to him face-to-face and told him that she was honest with him and was "really going for a home, which he didn't believe").)  After this incident, Mudie complained to HR again.  (Mudie Dep. at 32:22–33:2.)

According to Mudie, she also had difficulty getting permission from Pascale for time off while applying for U.S. citizenship.  (*Id.* at 45:24–47:11.)  Mudie claims that she requested a day to get her fingerprints taken at the immigration office and Pascale gave her trouble, told her to

have the immigration office expedite her fingerprints, and when she came back she "gave him documentation" because her ordered her to do so.  (*Id.*)

Mudie also alleges that Pascale did not allow her to take lunch breaks.  (*Id.* at 43:21–45:23.)  Pascale told her that he was unable to get coverage for her during lunch breaks.  (*Id.*)

### D.     *Mudie Experiences Mistreatment from Pascale when Pascale Comments on Her Culture and Background, and Mudie Complains to HR*

According to Mudie, Pascale frequently told her that she needed to learn English.  (Mudie Dep. at 17:15–19.)  For example, when Mudie was covering the front desk and Pascale arrived, she said, "Good morning, how are you?" to which he replied, "I'm peachy."  (*Id.* at 17:20–18:7.)  Not understanding the phrase, Mudie asked Pascale whether that was "good or bad."  (*Id.*)  Pascale responded that Mudie needed to learn English and "the American way."  (*Id.*)  Pascale suggested that Mudie buy a "slang book to learn the American terminology."  (*Id.* at 20:2–7.)  On a separate occasion, Pascale put two fingers up to make the "peace sign" and when Mudie did not understand what that meant, he told her "you need to learn our ways."  (*Id.* at 18:8–16.)  At another point, when Mudie was working the front desk, a patient used the word "Caucasian" and Mudie did not understand what the word meant.  (*Id.* at 24:12–25:6.)  When Mudie asked Pascale about this word, he laughed at her and again stated, "You need to learn the American ways."  (*Id.*)

Mudie testified that, twice, Pascale told her not to speak in meetings.  During an office staff meeting, he told her not to speak because she is "too direct" and "not everybody can handle the truth."  (*Id.* at 20:15–21:22, 22:17–22.)  Upset that everyone else was permitted to speak and she was excluded, Mudie wrote on a piece of paper, which she held up in front of her, "Can you please give me permission to speak in your meeting?"  (*Id.*)  Everyone laughed at Mudie, and Pascale denied her request.  (*Id.*)  During a separate meeting about a call center, Pascale

instructed Mudie not to speak, other than to identify herself, reiterating that she was too direct and that people's feelings would be hurt if she spoke.  (*Id.*; *see also id.* at 22:1–16 ("[Pascale] said Andrea, . . . don't say a[] word; because if you say it, they all is [sic] going to be offended, so I need you to just not say anything in my meeting.").)

In chastising Mudie for being too direct, Pascale referred to her national origin, stating, "maybe it's where you came from, the way you guys speak, you know, just say it as it is."  (*Id.* at 23:18–24:2.)  Mudie responded that she was brought up "to be honest and be fair," and Pascale replied, "Well, Andrea, you know, that's how you grew up there.  This is America."  (*Id.*)  At some point, Pascale also told Mudie that "islanders are more aggressive."  (*Id.* at 115:20–116:1, 116:12–15.)

Mudie also recounted an incident that occurred when a patient came to the office and was sweating and remarked that he believed his blood sugar was low because he is a diabetic and had not eaten all day.  (*Id.* at 118:4–119:19.)  Mudie offered her sandwich to the patient, who ate it. (*Id.*)  Pascale said, "Andrea, I know you're not American, because I wouldn't have done that.  I would have eat[en] my lunch and not give[n] it to the patient."  (*Id.*)

According to Mudie, Pascale also commented on her culture in September 2019.  (*Id.* at 25:9–26:17, 117:13–23.)  Pascale told Mudie that she had received two patient complaints in one week.  (*Id.*; *see also* Doc. No. 41-1 at ¶ 16) (noting that in September 2019, Pascale requested to speak with Christine Keck, Executive Director, Human Resources, regarding patient complaints about Mudie); Doc. No. 40-4 (Sept. 3, 2019 email from Pascale to Mudie stating that they needed to discuss a patient complaint he received regarding her lack of professionalism).)  Mudie did not believe that the complaints had actually occurred and said "shh to him" to interrupt him. (*Id.*)  Pascale responded, "You don't shh your boss . . . it's a culture thing, you wouldn't

understand." (*Id.*)  Mudie told Pascale that she was "tired of [him] talking about [her] culture and [her] background" and then went to HR and complained to Mazella.  (*Id.*)

That same week, Pascale also made a comment that "Trump should not only build a wall for – for the Mexicans, he should build a wall for all outsiders."  (*Id.* at 27:4–12, 27:24–28:1.)  Mudie complained to Mazella for the second time that week that she was being discriminated against.  (*See id.*)

On September 27, 2019, Chief Compliance Officer Margaret (Peg) McKeon and Mazella met with Mudie and later that day, McKeon met with Pascale.  (Doc. No. 40-4, Ex. 20 at 13.)  At that meeting, McKeon informed Pascale he could not take any scheduling or disciplinary action against Mudie "until further notice" without involving HR.  (*Id.* at ¶ 18.)  In addition, "as an interim measure to address" Mudie's "alleged inability" "to take a lunch hour break," PCOM decided to add a temporary employee to the Roxborough office on Monday through Wednesday.  (Doc. No. 40-4, Ex. 20 at 13.)  Further, HR was instructed to review Mudie's pay information dating back to February 2019 "to identify time at issue related to lunch breaks."  (*Id.*)  During this meeting, Pascale told McKeon that he felt that Mudie's report was "retaliatory in nature." (*Id.*)

### E.     Mudie Is Also Upset by Comments from Other Coworkers

According to Mudie, other coworkers, aside from Pascale, made comments or engaged in behaviors that upset her.  For example, once, a patient asked her if the doctor had "called in some coochie cream" but Mudie did not know "the meaning of coochie cream."  (*Id.* at 18:22–19:15.)  When Mudie asked her coworkers what the term meant, everyone just laughed at her, leading Mudie to "breakdown" and cry.  (*Id.*)

In the end of 2019 and early 2020, Angela Solomon,[1] a temporary employee who assisted at the Roxborough office, told Mudie that she did not want to work with "islanders."  (*Id.* at 52:14–54:19, 55:8–18; *see also id.* (testifying that Solomon told her that "Nathalie Rios, Michelle Turrentine, Michele Atkins, Janet Oquendo and Clarissa Singleby . . . all were saying that I was the only outsider and that they were happy that I was gone").)  Solomon also told Mudie that she had been warned about working with Mudie because the last employee who worked with Mudie had been fired and she believed that Mudie had been the cause of that employee's termination.  (*Id.* at 54:20–55:1.)

Mudie also alleges that Solomon, Michele Atkins, and Nathalie Rios[2] told her that she was going to be fired for repeatedly complaining to HR.  (*Id.* at 91:9–25.)  And in 2020, Linda Mongo, another coworker, told Mudie that she "better hurry up and get the hell out of here because [Mudie was] going to be fired soon."  (*Id.* at 93:8–14.)

### F.    *Mudie Receives a Threatening Letter via Interoffice Mail*

On October 16, 2019, Mudie reported that she had received an anonymous note through PCOM's interoffice mail.  (Doc. No. 41-1 at ¶ 22.)  The note said, "You should have never told on us.[3]  You will pay.  You might escape this time but next time you wont [sic]."  (Doc. No. 43

---

[1] On October 15, 2019, Mudie spoke with Mazzella in HR regarding concerns she had about Solomon. (Doc. No. 41-1 at ¶ 21.)

[2] Mudie also testified that Rios owed her money.  Because Rios could not pay back the money on time, Rios acted as "the information person"—i.e., she was the one to inform Mudie that "Charles [Pascale] [is] going to HR."  (Mudie Dep. at 92:8–13.)

[3] As discussed *infra* in connection with PCOM's investigations of Mudie and potential compliance concerns and *supra* in connection with Pascale and other coworkers' treatment of Mudie, Mudie complained multiple times to HR in September and October 2019.  (*See, e.g.*, Doc. No. 41-1 at ¶ 20 ("During Mudie's October 10, 2019 meeting with McKeon and Keck, Mudie also raised certain concerns about certain coworkers and Pascale."); *id.* at ¶ 21 ("On October 15, 2019, Mudie spoke with . . . Mazzella regarding Mudie's concern about . . . Solomon."); Doc. No. 40-4, Ex. 20 at 13 (discussing Mudie's September 27, 2019 complaint about Pascale).)

at ¶ 91; Doc. No. 41-5 at 1.)  PCOM investigated Mudie's report (Doc. No. 41-1 at ¶ 23), and the police were contacted (Doc. No. 43 at ¶ 91).

### G.      The October 24, 2019 Incident

Three days later, on October 24, an individual brought a note containing Mudie's username and password to the front desk of a PCOM building and claimed someone named Charles had paid him to deliver it.  (Doc. No. 41-1 at ¶ 25; *see also* Mudie Dep. at 92:8–18 (testifying that Rios told her that Pascale "got a hold of a crack head and gave him information . . . about me"); Doc. No. 41-4 ("Monger Dep.") at 22:8–24 (testifying that Mudie told her that Rios told her that a "crackhead had come into the office with Andrea's username and password and a counterfeit $50 bill and said that he was paid to go in and delete Andrea's email").) PCOM investigated the October 24 incident.  (Doc. No. 41-1 at ¶ 26.)

### H.      Mudie Complains about Pascale's Presence at the Roxborough Office

Next, on October 28, Mudie encountered Pascale (who worked at the City Avenue office) very early in the morning at the Roxborough office for no apparent reason.  (Doc. No. 41-1 at ¶ 27.)  Mudie reported this incident to PCOM.  (*Id.*)  PCOM investigated Mudie's allegation. (*Id.* at ¶ 29.)

An email from Joseph Smith, Security and Public Safety Lieutenant at PCOM, to Mazella, states that on November 4, he went to Roxborough Hospital and met with the hospital's Director of Security.[4]  (Doc. No. 40-7 at 8.)  Smith explained that they went through video footage of the hospital from October 28, 2019 to determine whether Pascale was at the hospital that morning.  (*Id.*)  He wrote, "We looked at both entrances that he would have been able to access without having the proper ID badge needed to gain entrance.  We checked from 6:50 a.m.

---

[4] However, Mudie testified that when she met with the head of security, she learned "that the cameras that were located around Gryzbowski's office were not working."  (Mudie Dep. at 83:12–24.)

to 7:30 a.m. and Mr. Pascale . . . never entered the building.  He was not seen on any videos.  At 7:14 AM, Andrea Mudie was seen entering the building."  (*Id.*; *see also* Doc. No. 40-8 at 4 (case report from Smith stating, "After follow-up with Director Wayne Boyd from Roxborough Hospital and looking at video I did not see Charles Pascale on any video entering the hospital. After trying to contact Mr. Boyd to look at video again and receiving no response from him at this time the investigation is inconclusive.  This investigation is closed at this time."); Doc. No. 40-4 at 11 (November 20, 2019 report stating that Pascale denied visiting the Roxborough office on October 28, and the hospital security video footage and PCOM campus video footage did not support Mudie's allegation that Pascale had been present that morning).)

When Pascale learned about Mudie's claim regarding his presence at the Roxborough office that day, Pascale alleged that Mudie was harassing and retaliating against him because he raised concerns about her job performance.  (Doc. No. 41-1 at ¶ 30.)

### I.      *PCOM Investigates Mudie*

Meanwhile, amid these various incidents and complaints, PCOM investigated Mudie for suspected violations involving compliance in the summer and fall of 2019.  First, in August 2019, PCOM investigated a potential time fraud issue involving Mudie.  (*Id.* at ¶ 15.)  Then, the following month, on September 20, PCOM's Compliance Office opened an investigation into a HIPAA violation alleged to have occurred on August 21, 2019 involving unauthorized access of a patient record by Mudie.  (*Id.* at ¶ 17.)  Specifically, it was alleged that Mudie accessed a patient's record on August 21 at the Roxborough office location and created a false appointment for 6:30 p.m. later that day at the Rowland Hall office, where Mudie was scheduled to work during the 6:30 p.m. period.  (Doc. No. 40-4, Ex. 19 at 8.)

On October 10, PCOM's Chief Compliance Officer McKeon and Executive Director of Human Resources Christine Keck met with Mudie to discuss a potential compliance issue

involving the processing of patient records and e-faxes.  (Doc. No. 41-1 at ¶ 19.)  During that

same meeting, Mudie raised concerns about certain coworkers and Pascale.[5]  (*Id.* at ¶ 20.)  On

October 31, Mudie met with Mazzella and McKeon again, to discuss a HIPAA compliance

concern.  (*Id.* at ¶ 28.)

On November 20,[6] PCOM's Compliance Office concluded its investigation into the

HIPAA violation and determined that Mudie had engaged in unauthorized access of a patient

record.  (*Id.* at ¶ 33.)  According to McKeon's investigation report, as part of the investigative

process, four individuals were interviewed:  Mudie, the patient, Pascale, and Clarissa Sydnor-

Daye, the Senior Patient Care Coordinator.  (Doc. No. 40-4 at 8.)  In addition, several documents

were reviewed in connection with the investigation, including the medical access report, Mudie's

time records for August 21, the Roxborough office computer and call logs for that day, the

Central Call Center logs for that day, PCOM's HIPAA policy, and PCOM's Code of Conduct.

(*Id.* at 9.)

The report states that the patient confirmed that she did not contact the Roxborough

office, or any other PCOM Family Practice office, to request an appointment.  (*Id.*)  The patient

stated that she had not visited the practice in a few years and was on a scheduled vacation when

she received a call from Sydnor-Daye on the afternoon of August 21 to confirm that she had an

appointment later that day.  (*Id.*)

According to the report, Mudie explained that her usual practice is to set up an

appointment either at the request of a clinician or upon receiving a call from a patient.  (*Id.*)

---

[5] Mudie met with Mazzella and McKeon again on October 21 to discuss her concerns about her coworkers and Pascale.  (*Id.* at ¶ 24.)

[6] As noted *infra*, Mudie filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 18—two days before the investigation was concluded.

However, "the findings [did] not support that explanation." (*Id.* at 11.)  An audit of call logs showed that there were no calls made to the Roxborough office (either direct or routed through the Call Center) on that day, at that time. (*Id.* at 9.)  The report also states, "The only clinician that has office hours at the Roxborough office is Joan Grabowski [sic], DO and the appointment was not scheduled with this clinician.  Further, [the patient] identified she was never seen at or would call the Roxborough office location for services." (*Id.*)

The audit also showed that Mudie clocked into the Roxborough office at 7:35 a.m. that day, that her NexGen credentials were used from that office location to access the patient's record at 8:27 a.m., and that the appointment was created at 8:28 a.m. (*Id.* at 10.)  According to the report, "No other staff were working at the Roxborough location at the time the patient appointment was created . . . [, and] [t]he possibility that the appointment was created for the wrong patient does not appear feasible." (*Id.*)

Under PCOM's Code of Conduct, PCOM employees "are not permitted to access confidential information," including, but not limited to, patient records, "which they do not need to know in order to perform their job duties." (*Id.*)  In addition, the PCOM Healthcare Standards Manual allows record disclosure only to the extent "allowed by federal HIPAA regulations"; disclosure, including accessing a patient record, is therefore "limited to an as needed [basis] for treatment, payment and operations basis." (*Id.*)  McKeon determined that Mudie's access of the patient's record did not fall under one of those three authorized categories. (*Id.* at 10–11.)  The Compliance Office also reported the HIPAA breach to the U.S. Department of Health and Human Services per regulations. (*Id.* at 11.)

According to the report, Pascale and Syndor-Daye both alleged that Mudie had improper motives for creating the patient appointment:  specifically, Pascale alleged time abuse and

Syndor-Daye alleged that Mudie had retaliatory motives.[7]  (*Id.* at 10)  However, given the ongoing animosity and longstanding history between the parties—namely, that Mudie complained that Pascale had created a harassing work environment and Pascale and Syndor-Daye had "made multiple reports related to [Mudie's] poor work performance" to HR—McKeon did not consider those alleged motives when making her determination that Mudie had improperly accessed the patient's medical records and did not make any credibility determinations.  (*Id.* at 10–11.)

The Compliance Office referred handling of the matter to HR.  (Doc. No. 41-1 at ¶ 34.) Mazella told Mudie that a HIPAA violation could result in termination.[8]  (*Id.* at ¶ 35.)

### J.    *The November 18, 2019 Charge*

On November 18, 2019—two days before the PCOM Compliance Office concluded its investigation concerning the HIPAA violation—Mudie filed a Charge of Discrimination with the EEOC and Pennsylvania Human Relations Commission (the "2019 Charge").  (*Id.* at ¶ 31.)  The Charge states:

> Since working for Respondent, Complainant has been told by her supervisor that she does not understand English well and does not understand the American way.  He has told her that she needs to go out and learn about America because she knows nothing about it . . . Complainants [sic] supervisor has also told her he can replace her any time.  Complainant has made several complaints to Human Resources regarding the discriminatory treatment by her supervisor. Since making complaints to HR, Complainant has been told by other co-workers that she will be fired.  On or about November 5, 2019, Complainant was terminated from her employment without being given a reason as to why.

---

[7] To that end, the "matter was initially reported to [HR] by practice management based on suspicion of retaliatory or improper motivation for creation of the appointment."  (*Id.* at 11.)

[8] Mudie alleges that during 2019, Mazella threatened her with termination twice.  (*See* Doc. No. 41-1 at ¶ 36; Mudie Dep. at 78:6–10.)

(Doc. No. 40-2, Ex. 9 at 10.)

Significantly, Mudie claimed in the 2019 Charge that PCOM had terminated her

employment on November 5, despite the fact that that was untrue and she remained employed

with PCOM.  (Doc. No. 41-1 at ¶ 32.)

The EEOC issued its Dismissal and Notice of Rights in connection with the 2019 Charge

on March 16, 2020.  (*Id.* at ¶ 40.)  Mudie did not pursue her claims in court within 90 days.  (*Id.*

at ¶ 41.)

### K.    Pascale Leaves PCOM

In February 2020, Pascale voluntarily resigned from PCOM.[9]  (*Id.* at ¶¶ 37–38.)

Following Pascale's departure, Mudie began reporting to Tiffany Floyd.  (*Id.* at ¶ 39.)

### L.    The New Chief Practice Operations Officer Changes Mudie's Schedule and Then Transfers Her

Five months later, in July 2020, PCOM hired a new Chief Practice Operations Officer,

Stephen Castellano.  (*Id.* at ¶ 42.)  Castellano reassigned certain individuals, including Mudie, to

different offices.  (*Id.* at ¶ 43.)  Castellano's stated reason for this decision was that he believed

Family Practice personnel could be deployed more effectively.[10]  (*Id.*)

In August 2020, Mudie was transferred to the Cambria office.  (*Id.* at ¶ 44.)  Mudie told

---

[9] Mudie claims that "in or around March 2020," Pascale wrongly accused her or stealing patient co-pays and office supplies.  (*See* Doc. No. 41 at 9.)  However, this timing is not accurate, given that Mudie admits that Pascale left PCOM in February 2020.  (Doc. No. 41-1 at ¶¶ 37–38.)

[10] Castellano testified that because a history of conflict between Mudie and the employees at the City Avenue location, he could not transfer Mudie to a location where individuals from the City Avenue location worked, and because he wanted two people at the Roxborough office, he needed to move Mudie. (*See* Doc. No. 43-3 ("Castellano Dep.") at 11:9–12:5 ("I knew there was some history with conflict between employees, so at the time when I arrived, Andrea – I don't know . . . was the cause was – she wasn't to come to the City Ave. location.  In other words, those – the individuals that worked there weren't to work in Roxborough and she wasn't to work at City Ave.  So I knew that she wouldn't work at City Ave.  I wanted to have two people at Roxborough, so I moved her to Cambria so that I could move two people to Roxborough.").)

Castellano that she objected; she complained about childcare issues and that it was a dangerous neighborhood. (*Id.* at ¶ 45; Mudie Dep. at 69:15–21; *see also* Mudie Dep. at 67:15–17, 67:24–68:6 ("Q: Why do you consider it a dangerous neighborhood? A: At one point in time while I worked there someone got shot outside[.]").) She also told Mazzella that she objected to the move, again citing childcare concerns. (Doc. No. 41-1 at ¶ 46; *see also* Mudie Dep. at 70:6–13, 75:17–21.)

Upset by the transfer, Mudie sent a letter of resignation to her new supervisor, Floyd, and Gryzbowski, giving her two weeks' notice. (Mudie Dep. at 70:17–19.) However, Floyd, Gryzbowski, and Monger convinced Mudie not to leave. (*See id.* at 71:5–14, 76:9–77:2.) Mudie testified that she told Floyd that she believed the move was retaliatory. (Doc. No. 41-1 at ¶ 48.)

Mudie disputes the stated reason for the transfer and suggests she was transferred because she complained about Pascale's discrimination. (*See id.* at ¶¶ 43–44; Mudie Dep. at 74:16–22 ("And what I mean by this is after going to HR numerous time [sic] on Charles, then I was brought to the office for at least five consecutive weeks being audited, violating HIPAA, being accused of these things, my things going missing. And here comes Steven telling me that he can't pleases [sic] everyone.").)

### M.   *Mudie Receives Another Threatening Letter*

In the fall of 2020, a patient reported that he had been asked to deliver a note to Mudie (the "2020 Halloween note"). (Doc. No. 41-1 at ¶ 49.) The note said, "Watch what you eat, drink and be scary! Told you we would get you. This is only the beginning, your best bet is to resign or lose your career. Your choice." (*Id.*) Gryzbowski, the doctor who practiced at the Roxborough office at which Mudie worked, testified that a patient told her that Rios had offered him money to send a threatening letter to Mudie. (Doc. No. 41-3 at 33:3–24.)

The parties dispute whether PCOM properly investigated the incident.  (*See* Doc. No. 41-1 at ¶ 50.)  Ultimately, PCOM dismissed the patient from the practice but did not discipline any employee (i.e., Rios) in connection with the incident.  (*Id.* at ¶ 51.)

> ### N.   *An Audit Reveals that Mudie Made Many Calls to Trinidadian Numbers on Company Time While Using Company Resources, and PCOM Terminates Her*

On December 1, 2020, PCOM Senior Infrastructure Analyst Shaun Carlin emailed Castellano and Floyd a routine audit report, which showed that calls were made from the Cambria office to 868 area code numbers.  (*Id.* at ¶ 52.)  The 868 area code is associated with Mudie's country of origin, Trinidad and Tobago.  (*Id.* at ¶ 61.)

Castellano alerted Mazella about the audit report and, in turn, Mazella notified PCOM's Compliance Office.  (*Id.* at ¶¶ 53–54.)  The Compliance Office, in conjunction with the Information Technology Services Department, conducted an investigation into the calls to the 868 area code.  (*Id.* at ¶ 55; Doc. No. 40-1, Ex. 3 ("Mazella Dep.") at 20:2–7.)  The Compliance Office asked Carlin to run a "control report" checking for any calls made to 868 numbers from the City Avenue and Lancaster Avenue locations.  (Doc. No. 41-1 at ¶¶ 55–56.)  Carlin reported back that it did not look like any calls were made to 868 numbers from those offices.  (*Id.* at ¶ 57.)

On December 3, Carlin provided the Compliance Office with a Call Detail Report for the period of October 1, 2019 to October 1, 2020.  (*Id.* at ¶ 58.)  The Call Detail Report showed that 310 calls,[11] totaling almost 27 hours,[12] were made from the Cambria and Roxborough offices to

---

[11] The Call Report also shows that, on 22 occasions, five or more calls were placed in a single day.  (*Id.* at ¶ 65.)  Ten or more calls were placed in a single day on five occasions.  (*Id.*)  Fifteen calls were placed on January 31, 2020 alone.  (*Id.* at ¶ 66.)

[12] As for the timing of the calls, the Call Report indicates that 19 calls lasted 15 minutes or longer.  (*Id.* at ¶ 67.)  This includes six calls that were 30 minutes or longer and one call that lasted nearly two hours.

868 numbers.  (*Id.*)  These calls were all made from the offices to which Mudie was assigned, and many were made during Mudie's working hours.  (*Id.* at ¶¶ 62, 64.)  Mudie admitted that she made the calls to the 868 numbers.[13]  (*Id.* at ¶ 63.)  PCOM incurred a cost of $0.33 per minute for these calls.  (*Id.* at ¶ 59.)

On December 11, the Compliance Office provided Mazzella with its findings.  (*Id.* at ¶ 60.)

On December 23, 2020, Mudie was informed that she would be terminated effective January 2, 2021.  (Doc. No. 40-9 at 28.)  Castellano and Mazzella made the decision to terminate Mudie's employment; Floyd had no involvement in or knowledge of the decision.  (Doc. No. 41-1 at ¶¶ 69–70.)  PCOM cited violations of its policies and code of conduct, including theft of time and unauthorized use of PCOM resources, as the bases for terminating Mudie's employment.  (*Id.* at ¶ 68.)

However, Mudie suggests that the firing was retaliatory (*see, e.g.*, *id.*) and claims that Mazzella and Westerberg[14] had previously given her permission to make the calls.  (*Id.*)  Mudie testified that Mazella first granted her permission to use PCOM's phone to contact her family in Trinidad and Tobago in February or March 2018, about three weeks after she started working for PCOM, when her first sister passed away.  (Mudie Dep. at 94:6–23, 104:11–20.)  Mudie also stated that Dr. Westerberg had given her permission to speak with her father when he was diagnosed with cancer.  (*Id.* at 95:25–96:7.)

_____

(*Id.*)

[13] Mudie testified that most of the family members she made calls to live in the United States; they just had Trinidadian numbers.  (Mudie Dep. at 96:9–17.)

[14] Dr. Westerberg was another doctor in the practice, and she was no longer employed by PCOM at the time Mudie was audited.  (Doc. No. 40-1, Ex. 3 ("Mazzella Dep.") at 21:17–24.)

Mudie believed that because she had gotten approval in 2018, she was allowed to use PCOM's phone in 2020.  (*Id.* at 95:10–24 ("When I was terminated from PCOM and I met with [Mazella], she indicated that she did a call log back from 2020 and that I stole from PCOM; however, I indicated to her that it was not from 2020.  You gave me permission prior to 2020. So I didn't only use the phone at PCOM in 2020, it was used prior, in the year before as well. And I remember when my first sibling had passed away that you told me that I could have used it, so I did."), 104:12–105:25, 106:11–107:7 ("Q: If I'm understanding you correctly, you seem to be saying that because you had a conversation with Christina Mazella in 2018 and that you believe based on that conversation in 2018 that you had permission to make these phone calls in 2020.  Is that correct?  A: Yes.").)

*     *     *

On May 11, 2021, Mudie initiated this lawsuit against PCOM and individual Defendants Pascale and Mazella.  (Doc. No. 1; *see also* Doc. No. 41-1 at ¶ 71.)  Two months later, on July 21, Mudie filed her First Amended Complaint.  (Doc. No. 7; *see also* Doc. No. 41-1 at ¶ 72.)  On August 3, Mudie filed EEOC Charge No. 530-2021-00464 (the "2021 Charge").  (Doc. No. 41-1 at ¶ 73.)  At Mudie's request, two days later, on August 5, the EEOC issue a Notice of Right to Sue in connection with the 2021 Charge.  (*Id.* at ¶ 74.)

On August 10, Mudie filed a Second Amended Complaint.[15]  (Doc. No. 14; *see also* Doc. No. 41-1 at ¶ 75.)  Shortly thereafter, Defendants filed a motion to dismiss.  (Doc. No. 20.)  On December 29, the Court granted the motion in part, dismissing Mudie's 42 U.S.C. § 1981 claim against all Defendants because she failed to allege facts supporting a claim of racial

---

[15] On September 15, Mudie voluntarily dismissed the individual Defendants from the Title VII claim and dismissed the claim she brought under the Pennsylvania Human Relations Act ("PHRA") against all Defendants.  (Doc. No. 19; *see also* Doc. No. 41-1 at ¶ 76.)  Because the Court later granted the motion to dismiss the § 1981 claim against all Defendants, PCOM is the only remaining Defendant in this case.

discrimination.  *Mudie v. Phila. Coll. of Osteopathic Med.*, --- F. Supp. 3d ---, 2021 WL 6136937, *3–8 (E.D. Pa. Dec. 29, 2021).  However, the Court denied PCOM's motion to dismiss the Title VII claim as time-barred, finding that, at the motion to dismiss stage, Mudie had pled sufficient facts for the Court to apply the continuing violation doctrine.  *Id.* at *8–*10.

Presently before the Court is PCOM's motion for summary judgment.  (Doc. No. 34.) Mudie opposes the motion.  (Doc. No. 41.)  The Court held oral argument on the motion on May 12, 2022.

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury.  *Anderson*, 477 U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.     Discussion

PCOM argues that summary judgment is appropriate on Mudie's hostile work environment, retaliation, and discrimination claims.[16] (Doc. Nos. 34, 42.)

The Court addresses each claim in turn below.

### A.      Hostile Work Environment

PCOM argues that Mudie's hostile work environment claim must be dismissed because it is largely based on Pascale's discriminatory comments, and given that Pascale left PCOM in February 2020, his conduct is time-barred. PCOM also contends that the continuing violation doctrine does not apply to toll the statute of limitations and that Mudie fails to state a hostile work environment claim as to the conduct that occurred within the limitations period because the conduct was not severe or pervasive and was entirely unrelated to her national origin. We

---

[16] PCOM also argues that to the extent that any of Mudie's claims were based on race discrimination, and not national origin discrimination, they should be dismissed for the reasons that the Court dismissed Mudie's § 1981 claim at the motion to dismiss stage. (Doc. No. 34.) Mudie asserts that she "is no longer bringing a claim for race discrimination" and that her "claims are based on national origin discrimination." (Doc. No. 41.) Therefore, we address only Mudie's national origin claims and grant PCOM's summary judgment motion to the extent Count II in Mudie's Second Amended Complaint can be construed as raising race discrimination claims.

address the limitations period argument first, followed by the merits argument.

**1. The Continuing Violation Doctrine Does Not Apply**

*a.    The Law*

"To bring suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (citing 42 U.S.C. § 2000e-5(e)(1)).  The continuing violation doctrine provides a limited exception to this requirement.  *See Lamb v. Montgomery Twp.*, Civil Action No. 15-6759, 2016 WL 7426125, at *9 (E.D. Pa. Dec. 23, 2013) ("Hostile work environment claims . . . may be premised on occurrences that fall outside the limitations period if the plaintiff can show that a continuing violation exists."); *see also Mandel*, 706 F.3d at 165 ("Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" (citation omitted)).

"To allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Mandel*, 706 F.3d at 165–66.  To proceed under a continuing violation theory, a plaintiff must show that that the act that fell within the limitations period and the acts that occurred prior to the applicable limitations period involved "similar conduct by the same individuals." *See id.* at 167 ("Mandel may proceed under a continuing violations theory. Mandel has alleged at least one act that falls within the statute of limitations period (i.e. Bachert calling her a 'bitch' during a meeting), and many of the acts that occurred prior to the applicable limitations period involved similar conduct by the same individuals, suggesting a persistent,

ongoing pattern."); *see also Lake v. Stryker Sales, LLC*, Civil Action No. 20-5554, 2022 WL 605293, at \*3–4 (E.D. Pa. Mar. 1, 2022).  And, as the Third Circuit has emphasized, "the reach of this doctrine is understandably narrow."  *Lamb*, 2016 WL 7426125, at \*9 (quoting *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014)).

The continuing violation doctrine does not apply to discrete discriminatory acts; in other words, discrete discriminatory acts are not actionable if they are time-barred, even if those discrete acts are related to other discriminatory acts that are timely alleged in the charge.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'  A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover it."); *id.* at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete act starts a new clock for filing charges alleging that act."); *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) ("*Morgan* established a bright-line distinction between discrete acts, which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim.  The former must be raised within the applicable limitations period or they will not support a lawsuit.  The latter can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period."); *see also Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 492–93 (M.D. Pa. Aug. 25, 2015) ("[T]he Supreme Court has differentiated between acts of discrimination that fall under the doctrine, which usually occur over a series of days or perhaps years and discrete acts falling outside the doctrine, wherein a single act of harassment is alone actionable." (cleaned up)).  Discrete discriminatory acts include termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful

discipline, denial of training, and wrongful accusation.  *Mandel*, 706 F.3d at 165; *O'Connor*, 440 F.3d at 127.

> b.    Analysis

Here, because Mudie filed her 2021 Charge[17] on August 3, 2021, any discriminatory act that occurred before October 7, 2020 would be time barred unless the continuing violation doctrine applies.

PCOM argues that the Court cannot consider Pascale's conduct in determining whether Mudie states a hostile work environment claim because he left PCOM in February 2020 and therefore his discriminatory comments and acts from 2018, 2019, and early 2020 are time barred, as they occurred long before October 7, 2020.  (Doc. No. 34 at 14–15.)  Mudie appears to concede that Pascale's conduct occurred outside the limitations period, as she solely argues that Pascale's behavior was part of a continuing violation.  (*See* Doc. No. 41 at 14–15.)  But Mudie argues that her termination, which undisputedly occurred during the 300-day period prior to her filing her 2021 Charge, is "the last act of a continuing practice of . . . a hostile work environment."  (*Id.* at 15.)

PCOM counters that the continuing violations doctrine does not apply because Mudie's termination was a discrete discriminatory act that cannot be "tacked on to save an otherwise untimely work environment claim."  (Doc. No. 34 at 16–17.)  The Court is unpersuaded by the non-binding cases that PCOM cites in support of this assertion.[18]

---

[17] The 2019 Charge does not form the basis of this lawsuit because Mudie failed to file her lawsuit within 90 days of receiving her Right to Sue letter from the EEOC on that Charge.

[18] One of the cases PCOM cites is a non-precedential Third Circuit case, *Zankel v. Temple University*, 245 F. App'x 196, 197–98 (3d Cir. 2007) ("Zankel contends that her firing, which fell within the 300-day window, constituted an unlawful adverse employment action and rendered the filing of the administrative complaint timely with respect to all of the older instances of discrimination under a 'continuing violation' theory . . . [W]e find no merit in her argument that her termination constituted a continuing violation of

Other courts in this Circuit have held that timely discrete acts can render non-discrete acts timely under the continuing violation doctrine, *see Kimes*, 126 F. Supp. 3d at 493 ("[A] discriminatory act occurred within the relevant time period; Ms. Kimes was terminated from her position with the University on October 21, 2013."); *see also Henderson*, 2022 WL 838119, at *7–9 (rejecting the defendant's argument that the plaintiff's discipline constituted a discrete event that could not render timely otherwise untimely acts and holding that because the plaintiff was disciplined within the relevant limitations period, it did "not appear from the face of the amended complaint that [his] hostile work environment claim [was] untimely"), as have courts in other Circuits, *see, e.g.*, *Guessous v. Fairview Prop. Inves., LLC*, 828 F.3d 208, 223 (4th Cir. 2016) ("[T]he issue in this case is whether non-time-barred discrete acts can be considered part of the series of separate acts that collectively create a hostile work environment, thus rendering a hostile-environment claim timely under the continuing-violation doctrine . . . If a constructive discharge can be part and parcel of a discriminatory pattern of conduct, we see no reason that a discrete act cannot.  So long as the act is part of the pattern of discriminatory treatment against the employee, then that act should be sufficient for purposes of the continuing-violation doctrine, even if the act would otherwise qualify as a discrete act that is independently actionable."

---

the earlier denials of reasonable accommodation, and therefore conclude that her ADA and Rehabilitation Act claims are indeed untimely.").  Another district court in this Circuit recently declined to follow *Zankel*.  *See Henderson v. Pa. State Univ.*, No. 4:21-CV-00872, 2022 WL 838119, at *8–*9 (M.D. Pa. Mar. 21, 2022) ("This Court finds *Zankel* unpersuasive and declines to follow it here.  The opinion is bereft of any genuine reasoning or analysis, and that court does not appear to have grappled with the intent of *Morgan* or the specific language that limits its holding only to untimely discrete acts.  Rather, the court in *Zankel* seems to have simply assumed that the narrow language employed by the Supreme Court in *Morgan* applies broadly to all discrete acts.  To the contrary, as the Fourth Circuit, the Court of Appeals for the Eleventh Circuit, and the Court Appeals for the District for Columbia have persuasively set forth, the holding in *Morgan* does not prevent a discrete act from rendering non-discrete acts timely under the continuing violation doctrine, so long as the discrete act is itself timely and constitutes a continuation or culmination of the defendants' discriminatory behavior.").  We are persuaded by the analysis in *Henderson*.

(cleaned up)); *Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) ("Where the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim."); *Lee v. Mission Chevrolet, Ltd.*, EP-16-CV-00034-DCG, 2017 WL 4784368, at *9 (W.D. Tex. Oct. 23, 2017) (holding "that a non-time-barred discrete act may constitute an act contributing to a hostile work environment claim and therefore, may properly be the basis for applying the continuation violation doctrine"). We follow suit here.[19]

However, the fact that at least one act occurred within the limitations period does not compel the conclusion that the continuing violation doctrine applies. The Court must now consider whether the acts that occurred within the statutory period and any non-discrete[20] acts that occurred prior to the applicable limitations period, involved "similar conduct by the same individuals."[21] Even viewing the facts in the light most favorable to Mudie and drawing every inference in her favor, as we must at this stage, the Court cannot conclude that this is the case.

---

[19] In addition, as PCOM acknowledges, the 2020 Halloween note that Mudie received from a patient occurred within the limitations period. Mudie, however, does not argue that this is a basis for the continuing violation doctrine to apply. (*See generally* Doc. No. 41.)

[20] At the motion to dismiss stage, we found that any threats of termination, wrongful accusations of stealing patient co-pays and office supplies, and the transfer to the Cambria office were untimely discrete acts that could not be aggregated under the continuing violations doctrine. *Mudie*, 2021 WL 6136937, at *9.

[21] Mudie does not address this aspect of the continuing violation theory in her very cursory analysis of the doctrine; rather, she suggests that it is enough that the termination occurred within the limitations period. Further, she hinges her argument solely on the fact that the Court found that the continuing violation doctrine applied at the motion to dismiss stage. (Doc. No. 41 at 15 (citing the Court's prior Memorandum and stating, "The record at summary judgment is consistent with Plaintiff's allegations at the pleadings stage, i.e., Plaintiff's termination was the last act of a continuing practice of discrimination, retaliation, and a hostile work environment.").) But this ignores the fact that the legal standards at the motion to dismiss and motion for summary judgment stage are *different*.

*Lake v. Stryker Sales, LLC* is instructive.  In that case, the plaintiff alleged that her former supervisor, Nathan Lynch, created a hostile work environment based on her sex, making comments such as he "popped his cherry" when he hired his first female employee and told her, while she was pregnant, that it was unacceptable for her to miss a national sales conference that was a few weeks before her due date. *Lake*, 2022 WL 605293, at *2.  After Lynch left the company, the plaintiff was assigned a new supervisor, Casey Davidson, and the plaintiff alleges that he also engaged in a hostile work environment by failing to ask her to present at a sales conference and excluding or ignoring her at the conference. *Id.* at *2–*3.  Lynch's comments occurred outside of the statutory period, and the Court found that the continuing violation doctrine did not apply because the incidents related to Davidson were "markedly different." *See id.* at *3 ("The only comments or incidents plaintiff cites that occurred on or after July 24, 2018 are from Davidson, not Lynch, and are wholly different in nature. She points to the fact that her sales territory was re-assigned in September 2018 and that her performance rating was unsatisfactory.  She also states that Davidson did not have her present at a sales conference in 2019 and asked her to sit farther from him at that conference.  These are markedly different events than the comments attributed to Lynch from 2017 and earlier in which he made derogatory comments directed at plaintiff regarding her pregnancy and about women.").

The court reasoned, "Plaintiff includes no allegations that Davidson, whether within the statutory period or prior, made derogatory comments to her, much less ones of the nature that Lynch made." *Id.* at *4.  Because "[i]t was not similar conduct" and "was not done by the same individual," the court concluded that "[n]o reasonable jury could find evidence of 'an act contributing to the claim' that occurred within the 300-day period to permit a continuing violation for a hostile work environment claim." *Id.*; *see also Lamb*, 2016 WL 7426125, at *9

25

("Plaintiff has not produced evidence to show that the Township's response to thefts in the Public Works Department, her treatment during her workers' compensation leave, the derogatory comments she heard, her termination for theft, or any of the other issues she identifies represented *frequent* acts *of the same subject matter*.").

So too here. Mudie advances a wide array of allegations in support of her hostile work environment claim in an everything-but-the-kitchen-sink manner. But, critically, they involve different conduct by different individuals.

Much of Mudie's hostile work environment claim rests on Pascale's conduct. She claims that he called her a "liar" when she requested time off to attend the closing on her home, that he was resistant when she asked for time off while applying for her U.S. citizenship and had to get her fingerprints taken at the immigration office, that he refused to let her take lunch breaks, that he told her she needed to learn English and "the American way," that he told her not to speak in meetings because she spoke aggressively due to her culture, that he said President Trump should build at a wall to keep out all outsiders, and that he paid someone to deliver a note with her username and password. While Pascale's comments are upsetting and objectionable and, if true, may support a hostile work environment claim, they occurred outside of the limitations period. And the continuing violation doctrine does not apply because Pascale's alleged discriminatory comments are "markedly different" from the events that occurred during the limitations period and ultimately led to Mudie's termination by different individuals—the audit and investigation into her calls to 868 numbers.

Significantly, Pascale left PCOM in February 2020, and Mudie was not terminated until approximately eleven months later on January 2, 2021 (and was given notice of said termination on December 23, 2020)—it defies logic that Pascale could have been involved in her

termination.[22]  As in *Lake*, there is nothing in the record to suggest that Mudie's termination in

late 2020/early 2021 was part of a larger pattern to subject her to a hostile work environment.

Mudie includes no evidence that the individuals who terminated her, Mazella and Castellano,

also made discriminatory comments of the nature that Pascale made.  Ultimately, it was not

similar conduct, and it was not done by the same individuals.  Accordingly, the Court agrees

with PCOM that summary judgment is warranted to the extent that Mudie's hostile work

environment claim is based on Pascale's conduct.  *See Lake*, 2022 WL 605293, at *3–*4.

*Contra Kimes*, 126 F. Supp. 3d at 493 ("In July 2012, Sergeant Savero stated that 'he doesn't

feel comfortable with female officers' and did not want Ms. Kimes on his shift [and] in October

2013, Chief Bermann told Ms. Kimes that, because she is a 'female' he understood how Scranton

police officers 'intimidated' her.  In the summer of 2012, Ms. Kimes was ordered to clean the

Departments' break room despite the fact that no other officer had ever been ordered to clean the

break room. . . . The statements and actions taken by Ms. Kimes' supervisors were all connected

by a single thread—an apparent belief that women were inherently incapable of performing the

duties associated with being a police officer, and assigning tasks that were, in their eyes, more

suitable for women. . . . [T]he court concludes that the continuing violation doctrine does apply

in this matter.").

　　　　As to her other co-workers, Mudie testified that in late 2019 or early 2020, Solomon told

---

[22] There is no evidence that Pascale was involved in the Halloween 2020 threatening note.  Rather, the testimony indicates that if anyone at PCOM was involved, it was Rios.  At oral argument, Mudie argued that "Castellano" is the "connector" between Pascale's conduct and the ultimate termination.  (*See, e.g.*, Draft Hr'g Tr at 9:10–10:20, 13:22–14:25.)  Mudie argued that Rios and Castellano worked together, Rios knew that Mudie complained to HR about Pascale's discriminatory comments in 2019, Rios sent the Halloween 2020 note in retaliation for Mudie's 2019 complaints about Pascale, and then Castellano failed to fire Rios for sending the threatening note to Mudie.  The Court is unpersuaded by this incredibly attenuated argument.  Notably, Castellano and Pascale did not work at PCOM at the same time; therefore, it is impossible for Mudie to meet the "similar conduct by the same individuals" continuing violation standard based on Castellano.

her that she did not want to work with "islanders" and that Rios, Turrentine, Atkins, Oquendo, and Singleby also wanted her to leave because she was "the only outsider," that Solomon, Atkins, Rios, and Monger told her that she was going to be fired for repeatedly complaining to HR, and that unidentified co-workers laughed at her at an unidentified time because she did not know "the meaning of coochie cream."  As with Pascale, there is no evidence in the record showing that any of these co-workers were involved with the decision to terminate her employment with PCOM.  And there is no record evidence that Castellano[23] and Mazella[24]

---

[23] In the summer of 2020, Castellano transferred Mudie to the Cambria office, which was located in a more dangerous neighborhood.  Mudie alleges the transfer was done in retaliation for her complaints about Pascale—though the evidence shows that Castellano joined PCOM many months after Pascale left the company in early 2020.  The transfer is a discrete, discriminatory act, and the continuing violation theory does not apply to it.  *See supra* n.20; *see also McCann v. Astrue*, 293 F. App'x 848 (3d Cir. 2008) ("The law makes clear that discrete discriminatory acts that are actionable on their own may not be aggregated under a continuing violation theory."); *O'Connor*, 440 F.3d at 127.  However, as Mudie's counsel stated at oral argument, the transfer may be used "as background evidence in support of [a] timely claim."  *See Titus-Morris v. Banc of Am. Card Servicing Corp.*, 512 F. App'x 213, 217 (3d Cir. 2013) ("[B]ecause each of the alleged discriminatory acts occurred outside of the limitations period, they cannot in the aggregate form the basis for a hostile work environment claim.  However, Titus-Morris may cite those discrete occurrences as background evidence in support of her timely claim that her eventual termination constituted unlawful discrimination under Title VII."); *see also Morgan*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. . . . The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.").  Regardless, even if we consider the transfer as "background evidence," there is no evidence in the record connecting the transfer to her termination.

[24] The Court notes that Mudie alleges in her brief that Mazella failed to investigate her complaints.  (*See, e.g.*, Doc. No. 41-1 at ¶ 86 ("In or around 2020, Plaintiff's co-worker Angela Solomon told Plaintiff that she did not want [sic] work with 'islanders.'  Plaintiff reported this to Defendant Mazella.  However, upon information and belief, nothing was ever done about it."); *id.* at ¶ 87 ("In or around March 2020, Plaintiff's managers, including Defendant Pascall [sic] wrongly accused Plaintiff of stealing patient co-pays and office supplies . . . Plaintiff felt like she was being set up and reported this to Defendant Mazella.  Defendant Mazella said she would look into it.  However, upon information and belief nothing was ever done about it.").)  But at the summary judgment stage, assertions that are merely based "upon information and belief" are insufficient.  *Cf. Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Cooperative*, Civil Action No. 15-6480, 2021 WL 1907501, at *3 (E.D. Pa. May 12, 2021) ("Statements in affidavits made only on information and belief may not be considered in support of or in opposition to summary judgment." (cleaned up)); *Disilverio v. Serv. Master Professional*, Civil Action No. 05-1368, 2007 WL 1029759, at *7 (W.D. Pa. Mar. 31, 2007) ("Ultimate or conclusory facts and conclusions of law, as well as statements made on belief or 'on information and belief', cannot be utilized on a summary judgment

engaged in similar conduct.

Because the pre-October 7, 2020 and post-October 7, 2020 acts did not involve "similar conduct by the same individuals," the Court holds that the continuing violation doctrine does not apply, and we will not consider acts that happened before October 7, 2020 in deciding whether Mudie has presented sufficient evidence to support a hostile work environment claim

### 2.  <u>Mudie Does Not Establish a Hostile Work Environment Claim</u>

Turning to the events that occurred within the applicable period, the Court must determine whether Mudie has established a hostile work environment claim.  To establish a hostile work environment claim, a plaintiff must show (1) that she suffered intentional discrimination because of her national origin; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability.  *Mandel*, 706 F.3d at 167; *Hukman v. Am. Airlines, Inc.*, 796 F. App'x 135, 142 n.7 (3d Cir. 2019).  To determine whether an environment is hostile, a court considers the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168.

The Court considers the events that transpired between October 7, 2020 and Mudie's

---

motion.").  And, in any event, Mudie does not contend that failure to properly investigate her complaints against Pascale and her co-workers constitutes "similar conduct" as that which occurred in the limitations period.  Likewise, the Court notes that Mudie claims that Mazella threatened to terminate her in 2019 (*see* Doc. No. 41-1 at ¶ 36); however, threats of termination are discrete discriminatory acts and thus the threats from 2019 cannot be aggregated under a continuing violations theory and may only be considered as background evidence.  Mudie does not argue that the 2019 threats of termination relating to the HIPAA violation are connected to her ultimate termination for making calls to 868 numbers nor does she point to any evidence in the record showing such a connection.

termination, which only include the following:  the Halloween 2020 anonymous note that a patient delivered to Mudie and Rios allegedly authored, which said, "Watch what you eat, drink and be scary!  Told you we would get you.  This is only the beginning, your best bet is to resign or lose your career.  Your choice"; the investigation that PCOM conducted into the incident, which Mudie claims was deficient because Rios was never fired or otherwise disciplined; and the audit and investigation into Mudie's calls to 868 numbers, which ultimately resulted in her termination.

"Only harassment motivated by a discriminatory animus is prohibited.  In other words, the harassment must be instigated by unlawful discrimination."  *Bishop v. City of Philadelphia (Dep't of Prisons)*, Civil Action No. 20-3977, 2021 WL 4477097, at *11 (E.D. Pa. Sept. 20, 2021) (granting summary judgment for the employer where the plaintiffs, who were a couple, brought a hostile work environment claim based on anonymous letters that the husband received at work that referred to the wife as his "Barbie doll" wife and girlfriend and holding that the notes did not show discrimination based on the sex).

Where, as here, none of the putative acts are facially discriminatory, a plaintiff must point to record evidence that can support a finding that the otherwise neutral actions had any relation to a protected characteristic, such as national origin.  *See Anderson v. Boeing Co.*, Civil Action No. 15-3073, 2016 WL 9446648, at *24 (E.D. Pa. Aug. 30, 2016), *aff'd*, 694 F. App'x 84 (3d Cir. 2017) ("The record does not support a finding of impropriety with respect to the layoff—indeed, the record is devoid of evidence that could give rise to a finding of race or national origin discrimination in the RIF process.  As for the non-layoff actions, the record cannot support an inference that any of the actions were improperly motivated by [the plaintiff's] race or national origin.  For instance, [the plaintiff] points to no evidence that other individuals outside of her

protected classes were treated differently than her . . . The dearth of evidence leads the Court to conclude that no reasonable fact-finder could find that any of the putative actions had a race- or national-origin-based component or that they were motivated by an improper discriminatory purpose.  Thus, [the plaintiff] cannot assert a prima facie case of a hostile work environment based on race or national origin discrimination."); *Larochelle v. Wilmac*, 210 F. Supp. 3d 658, 694–95 (E.D. Pa. 2016) ("[I]t is not clear that M.M.'s refusal to work with Shearer, Geib's statement that 'if I was your husband, I would beat the crap out of you,' and L.N.'s behavior was rooted in any discriminatory animus towards Shearer based on her national origin.  Certainly, facially neutral mistreatment may often conceal a more sophisticated and subtle form of discrimination; however, Shearer has presented no additional evidence to indicate that M.M.'s refusal to work with her, this particular comment from Geib, or L.N.'s behavior concealed an intent to discriminate against Shearer on the basis of national origin."); *see also Noel v. Boeing Co.*, Civil Action No. 09-3613, 2011 WL 4389547, at *8 (E.D. Pa. Sept. 21, 2011) ("Noel has presented no evidence that the other incidents were in any way related to his race or national origin . . . The allegation that Maull would hit Noel on the head or back, if true, is certainly troublesome, but there is no evidence to connect such behavior with a discriminatory purpose."); *Subh v. Wal-Mart Stores Inc.*, 2009 WL 4015649, at *7–*9 (D. Del. Nov. 19, 2009), *report and recommendation adopted*, 2010 WL 1286183 (D. Del. Mar. 30, 2010), *aff'd*, 386 F. App'x 31 (3d Cir. 2010) (granting summary judgment on the plaintiff's hostile work environment and discrimination claims because there was no record evidence from which a reasonable factfinder could conclude that his employer exhibited animus based on his race or national origin).

Here, the Halloween 2020 note does not reference Mudie's national origin.  Critically, Mudie has failed to point to any record evidence that shows that this note bore any relation to her

national origin.  As noted *supra*, at oral argument, Mudie argued that Rios sent the Halloween

2020 note in retaliation for Mudie complaining to HR about Pascale.  (*See* Draft Hr'g Tr. at

14:1–25.)  But her only evidence is that in 2019, Rios was aware that Mudie had complained to

HR about Pascale's comments related to her national origin and told her that she was going to

get fired for complaining so much.  This is a very attenuated link:  Rios told Mudie she would be

fired for complaining in 2019 but did not send the Halloween 2020 note until late 2020.  The

Court finds that Mudie has not met her burden of showing a link between the Halloween 2020

note and her national origin.  Similarly, there is no record evidence indicating that PCOM's

investigation (or lack thereof) into the note or into her calls to 868 numbers were due to her

national origin.  Mudie has not produced any evidence showing that Castellano or Mazella

harbored any discriminatory animus towards her or that their decision to terminate her was

motivated by her national origin.  Nor does Mudie argue that any other nursing assistants

similarly situated to her were treated differently than her.[25]

Because no reasonable juror could find that the Halloween 2020 note, the investigation

into this note, or the investigation into the 868 calls bore any relation to Mudie's national origin

or were motivated by discriminatory animus, the Court need not consider whether the conduct

was severe or perversive and grants PCOM's motion for summary judgment on the hostile work

environment claim.

---

[25] To the contrary, Mudie references the testimony of Nadira Duckett, a call center employee, who also
had a "horrible experience" at PCOM.  (*See* Doc. No. 41 at 12.)  Mudie does not point to any evidence
that Duckett was also from Trinidad and Tobago.  Pickett testified that she filed a grievance with Mazella
after Dr. Westerberg invaded her personal space and "boxed [her] in" and that Mazella never did
"anything about it."  (Doc. No. 41-7, Ex. F ("Pickett Dep.") at 31–38.)  Duckett also filed a police report
about the incident.  (*Id.*)  According to Pickett, "PCOM was a horrible experience -- *it didn't make any of
us feel good*."  (*Id.* at 53:21–23 (emphasis added).)  This undermines Mudie's claim that she was targeted
specifically.  Rather, it suggests that PCOM was a toxic environment for all, regardless of protected
status.

### B.    *Retaliation*

PCOM asserts that to the extent the retaliation claim is based on Mudie's transfer to the Cambria office in August 2020, the claim was not administratively exhausted and is time-barred. PCOM also argues that the retaliation claim should be dismissed to the extent is based on Mudie's termination because Mudie cannot establish a causal connection between any protected activity and her termination.  And, in its reply, PCOM contends that the retaliation claim should be dismissed because Mudie has abandoned the claim by failing to respond to PCOM's argument that there was no causal connection between any protected activity and her termination.

\* \* \*

The *McDonnell Douglas* burden shifting framework applies to Mudie's retaliation claim. First, Mudie must state a prima facie case of retaliation, after which the burden shifts to PCOM to articulate a legitimate, non-retaliatory reason for its actions.  Then, the burden shifts back to Mudie to show that the stated reasons are pretextual.  *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006).

To make out a prima facie case of retaliation, Mudie must show that (1) she engaged in a protected activity; (2) she "was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity"; and (3) "there is a causal connection between the protected activity and the adverse action."  *Id.* at 340–41.

### 1.   Retaliation Based on Transfer to the Cambria Office

PCOM argues that to the extent the retaliation claim is based on Mudie's transfer to the Cambria office, it is time barred.  At oral argument, Mudie conceded that she is not bringing the retaliation claim based on the transfer alone.  (Draft Hr'g Tr. at 15:12–21.)

We agree that to the extent the retaliation claim is based on the transfer, it is time barred.

As noted *supra*, Title VII requires a claimant to file a charge with the EEOC within 300 days of the alleged unlawful employment practice. *Mandel*, 706 F.3d at 164; *see also Valentin v. Manpower Grp. Sols.*, 792 F. App'x 208 (3d Cir. 2019). Here, the transfer occurred in August 2020. Assuming that the transfer occurred on the latest possible date in August (August 31, 2020), Mudie had until June 27, 2021 to file a Charge of Discrimination related to the alleged retaliatory transfer. She did not do so.[26] Thus, to the extent that Mudie bases her retaliation claim on her transfer to the Cambria office, that claim is time barred. *See Ponton v. U.S. Dep't of Justice*, Civil Action No. 09-197, 2010 WL 11595302, at *6 (E.D. Pa. Mar. 9, 2010) ("Plaintiff filed a charge with the EEOC against Defendant . . . on August 8, 2007 and he therefore cannot pursue a retaliation claim based on retaliatory acts that occurred prior to October 12, 2006. Several of the acts that Plaintiff believes were retaliatory occurred long before that date, including the transfer to a less desirable position, the deprivation of overtime opportunities, and the interference with an attempt to earn a promotion."); *see also Nitkin v. Main Line Health*, Civil Action No. 20-4825, 2021 WL 4860742, at *19 (E.D. Pa. Oct. 18, 2021) ("Here, Nitkin moved from full-time to part-time on December 5, 2017 and from part-time to per diem on August 8, 2018, but she did not file her Charge of Discrimination with the [EEOC] until October 21, 2019—over 300 days after either of her reduction in hours requests. Thus, to the extent Nitkin bases any of her claims on her reduction in hours, those claims are time-barred."); *see also Trent v. Test Am., Inc.*, Civil Action No. 10-1290, 2011 WL 3606646 (E.D. Pa. Aug. 16, 2011) ("Counting backward 300 days from October 15, 2009, it follows that the only discriminatory acts to survive the statute of limitations would be acts that took place on or after

---

[26] A transfer is a discrete discriminatory act and individually actionable; therefore, the clock began running the date the transfer occurred. *See, e.g.*, *O'Connor*, 440 F.3d at 127.

December 19, 2008.  Each of the allegations of discrimination and retaliation set forth in . . .

plaintiff's amended complaint occurred prior to December 19, 2008.  Plaintiff's time-barred

allegations include denial of training and termination and are not continuing violations that can

extend the statute of limitations.").

### 2.   **Retaliation Based on Termination**

Next, PCOM argues that to the extent that Mudie's retaliation claim is based on her

termination, summary judgment is warranted because Mudie has not shown that there is a causal

connection between any protected activity and her termination.

Mudie asserts, in a conclusory fashion, that "it is undisputed that [she] complained about

discrimination and retaliation" and therefore engaged in protected conduct.  (Doc. No. 41 at 13

(citing Doc. No. 41-1 at ¶¶ 20, 48).)  The only two instances Mudie specifically cites occurred in

October 2019, when she complained about Pascale, and the summer of 2020, when she told

Floyd, her new supervisor, that she believed her transfer was retaliatory.[27]  (*See* Doc. No. 41-1 at

¶¶ 20, 48.)[28]  For the purposes of this motion, the Court assumes that Mudie's complaint to Floyd

in the summer of 2020, which is the last complaint she cites, constituted protected activity.

However, even when viewing the evidence in the light most favorable to Mudie and drawing all

inferences in her favor, the Court cannot find that Mudie has shown a causal connection between

that complaint and her termination in late December 2020/early January 2021.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an

---

[27] Mudie admits that she did not tell either Castellano or Mazella that she felt the move was retaliatory. Accordingly, she does not argue that the complaints she made to them about her transfer for other reasons (e.g., childcare concerns and the dangerousness of the neighborhood) constituted protected activity.

[28] Interestingly, in arguing that she engaged in protected activity, Mudie failed to mention the November 2019 Charge of Discrimination she filed with the EEOC.

unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Oden v. SEPTA*, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015) (citation omitted).  Other evidence may also support a causal link.  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference. . . . Moreover, we have been willing to explore the record in search of evidence, and our caselaw has set forth no limits on what we have been willing to consider.").

First, the Court agrees with PCOM that the time between Mudie's complaint to Floyd in the summer of 2020 and her December 23, 2020 notice of termination is not unusually suggestive and does not raise an inference of causation.  *See LeBoon v. Lancaster Jewish Cmm'ty Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *Nitkin*, 2021 WL 4860742, at *15 (finding that a temporal proximity of several months—from March 2019 to July 16, 2019—was not unusually suggestive); *Collins v. Kimberly-Clark Pa., LLC*, 247 F. Supp. 3d 571, 601 (E.D. Pa. 2017) ("[I]f Plaintiff could establish her January 2, 2012 mass email complaint was a protected activity, without more, three months' separation is not particularly suggestive of a causal link in the context of this case."); *cf. Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (holding that temporal proximity was unduly suggestive where the plaintiff was terminated seven days after she engaged in protected activity).  And, at oral argument, Mudie

conceded that the temporal proximity is long to establish causation.  (Draft Hr'g Tr. at 16:5–8.)

Nor does Mudie point to any record evidence suggesting a pattern of antagonism between when she complained to Floyd and her termination.  Rather, Mudie admits that she worked at the Cambria office "without incident" until the incident with the anonymous note in October 2020, which Rios allegedly authored.  (*See* Doc. No. 41-1 at ¶ 49.)  The fact that she worked at the Cambria office "without incident" from August 2020 to October 2020 undermines any assertion that there was a pattern of antagonism.  Further, the anonymous note, and PCOM's reaction to it, do not evidence a pattern of antagonism; there is no evidence that Rios (or any other employee) engaged in any other inappropriate or threatening conduct towards Mudie afterwards.  Moreover, Mudie does not proffer any evidence that the initial audit report that led to the subsequent investigation into the 868 calls was antagonistic.  Rather, the uncontroverted evidence shows that the audit reports were generated as a matter of course and that Mudie was not specifically targeted.  (*See* Mazella Dep. at 18:12–19:7 ("Q: And who would request to make those types of audits?  A: So basically they're automatic reports that are sent to department heads.  Q: In your capacity as chief human resources officer, do you ever request specific audits to be done?  A: No.  Q: Were you aware of Andrea Mudie ever being audited, whether requested by – if not you, maybe somebody else?  A: No.  Q: Could someone else ask for a specific audit to be done on their employee at PCOM?  A: So our compliance officer could ask for a phone log if they felt like – if they got complaints about misuse of PCOM property.  Q: Were you aware of any complaints against Andrea for misuse of PCOM property?  A: Not aware of any complaints.").)  Based on this record, no reasonable juror could find a causal connection between Mudie's complaint to Floyd in the summer of 2020 and her termination in late December 2020/early January 2021.

Finally, it is undisputed that Mazella and Castellano made the decision to terminate

Mudie and that Floyd played no role in that decision.  Mudie proffers no evidence that Mazella

or Castellano knew that Mudie complained to Floyd that the transfer was retaliatory.  This is a

death knell for her retaliation claim.  *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 197 (3d

Cir. 2015) (holding that the plaintiff could not establish a causal connection between her

protected activities and the adverse action because the decision makers "lacked knowledge of her

protected conduct"); *id.* at 196 ("The plaintiff . . . cannot establish that there was a causal

connection without some evidence that the individuals responsible for the adverse action knew of

the plaintiff's protected conduct at the time they acted."); *see also Ambrose v. Twp. of Robinson,*

*Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a

substantial or motiv[at]ing factor in a decision, the decisionmakers must be aware of the

protected conduct."); *id.* (holding that the plaintiff failed to sustain his "burden of proof" where

he did not point to any evidence showing that the decisionmakers knew about his affidavit, the

protected activity, when they voted to suspend him).

For these reasons, the Court concludes that Mudie cannot state a prima facie case of

retaliation.[29]  Because Mudie has not met her burden, we need not consider whether Mudie has

---

[29] In the alternative, the Court finds that Mudie abandoned her retaliation claim by failing to address PCOM's arguments that she could not state a prima facie case of retaliation because there was no causal connection.  Therefore, Mudie has failed to show a genuine issue of material fact as to whether there was a causal connection between her complaint to Floyd and her termination.  *See, e.g., Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478 (E.D. Pa. 2014) ("Other district courts in our Circuit have found that waiver is a necessary corollary to the principle that summary judgment is appropriate where the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case.  Thus, when a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure constitutes an abandonment of those causes of action and essentially acts as a waiver of these issues.  Because Campbell has failed to address JLP's retaliation argument in her response, she has failed to meet her burden of identifying specific facts showing a genuine issue as to any retaliation claim."); *Skirpan v. Pinnacle Health Hosp.*, Civil Action No. 1:07-CV-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010) ("Where a plaintiff has brought a cause of action which is challenged through [sic] motion for summary judgment as legally insufficient, it is incumbent upon the plaintiff to affirmatively respond to the merits of a summary

shown that PCOM's stated non-retaliatory reason for firing her (i.e., using company resources to place calls during work time) was pretextual.

### C.    Discrimination

Last, PCOM argues that summary judgment is warranted on Mudie's discrimination claim because Mudie has produced no evidence showing that PCOM's decision to terminate her had anything to do with her national origin.  In its reply, PCOM also argues that Mudie has abandoned her discrimination claim by failing to address the arguments it raised in its motion.

The *McDonnell Douglas* burden shifting framework governs Mudie's discrimination claim.  Therefore, as with her retaliation claim, Mudie must first state a prima facie case of discrimination, at which point the burden shifts to PCOM to state a legitimate, non-discriminatory reason for firing her.  If PCOM does so, the burden shifts back to Mudie to show that PCOM's stated reasons are pretextual.

"To state a prima facie case of national origin discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination."  *Hukman*, 796 F. App'x at 141 n.5.  The parties agree that Mudie is a member of a protected class, was qualified to be a medical assistant, and that her termination constitutes an adverse employment action.  As such, the fourth prong is the only element arguably in dispute—although, inconceivably, Mudie does not address this in her brief.[30]

---

judgment motion.  Indeed, a plaintiff's failure to respond to these arguments constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues.").

[30] Accordingly, in the alternative, the Court finds that Mudie waived her discrimination claim by failing to address the fourth element.  Mudie failed to show that there is any genuine issue of material fact that her termination occurred under circumstances giving rise to an inference of unlawful discrimination.  *See*

To establish that an adverse employment action occurred under circumstances giving rise to an inference of discrimination, a plaintiff may either (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances)" or (2) "rely on circumstantial evidence that otherwise shows a causal nexus between [the plaintiff's] membership in a protected class and the adverse employment action." *Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d. Cir. 2014); *Williams v. Fed. Express Corp.*, Civil Action No. 20-5527, 2022 WL 1265529, at *4 (E.D. Pa. Apr. 28, 2022). Mudie has not introduced any comparator evidence; accordingly, we only consider whether she has pointed to circumstantial evidence that her termination occurred under circumstances that give rise to an inference of discrimination.

Mudie's "subjective belief that her termination was motivated by discriminatory intent is insufficient to support an inference of discrimination." *Williams*, 2022 WL 1265529, at *6; *see also Hukman*, 796 F. App'x at 142 ("Hukman's subjective belief that she was not promoted because of her national origin is insufficient to make out a prima facie case of discrimination."). To show discriminatory intent, Mudie must present circumstantial evidence that she was terminated *because of* her national origin. *See Greene*, 557 F. App'x at 196; *Williams*, 2022 WL 1265529, at *6. Mudie has not done so here. The evidence shows that Mudie was terminated because a routine report that an IT analyst ran revealed that she placed many calls to 868 numbers from work phones during work hours, and Mudie confirmed that she made those calls. Specifically, Mudie made 310 calls, which together accumulated to nearly 27 hours, and the cost of these calls to PCOM was $0.33 a minute, for a total of $534.60.

Nothing in the record suggests that the decisionmakers, Castellano and Mazella, harbored

---

*supra* n.29.

any discriminatory intent towards Mudie[31] or that Mudie's national origin factored into that decision or tainted the termination process in any way. *See Greene*, 567 F. App'x at 196 ("Greene otherwise failed to produce evidence that could give rise to an inference of discrimination because the evidence that he produced could not establish a causal nexus between the termination of his employment and his membership in a protected class. The evidence actually produced amounts to a collection of stray remarks and unconnected, coincidental circumstances, and related speculation and conjecture. Even in sum, and considered in the light most favorable to him, such evidence does not a causal nexus make." (cleaned up)); *cf. Park v. Sec. U.S. Dep't of Veterans Affairs*, 594 F. App'x 747, 749–50 (3d Cir. 2014) (concluding that the plaintiff—who claimed that she was involuntarily committed because she was Korean—did not show a nexus between her national origin and involuntary commitment and explaining that "the record suggest[ed] that [her] commitment had everything to do with the fact that she suffered paranoid delusions and had been mentioning the notion of suicide to her coworkers and nothing to do with her status as a Korean immigrant" (cleaned up)).

Because Mudie has failed to show that she was terminated under circumstances giving rise to an inference of discrimination, she cannot state a prima facie case of discrimination and summary judgment is appropriate.[32]

---

[31] At oral argument, Mudie argued that Castellano harbored discriminatory animus towards her because he did not fire Rios after Rios allegedly sent the Halloween 2020 note, which Mudie contends Rios sent in retaliation for the complaints Mudie made to HR about Pascale's comments relating to her national origin. (*See* Draft Hr'g Tr. at 13:16–14:25, 22:2–19.) But, again, Mudie has failed to show a nexus between the note and her national origin.

[32] Although the Court need not address whether PCOM's stated reason for terminating her was pretextual, since she failed to make out a prima facie case, in the alternative, the Court finds that Mudie has failed to show that PCOM's stated reason for terminating her was pretextual. Mudie claims to have received permission from Westerberg and Mazella to make the calls in 2018 and therefore its stated reason for firing her is pretextual. Viewing the facts in the light most favorable to Mudie, even if she did receive prior permission to make calls in those extraordinary circumstances (a death in a family and her father's cancer diagnosis), it does not mean that PCOM's decision to change its mind later on was motivated by

## IV.    Conclusion

For the foregoing reasons, the Court grants PCOM's motion for summary judgment.

An appropriate Order follows.

---

discriminatory animus or that PCOM's stated reason for firing her was inconsistent.  *See, e.g.*, *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) ("To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."); *Bolton v. Bay Valley Foods, LLC*, Case No. 3:17-cv-69, 2020 WL 1853505, at *18 (W.D. Pa. Apr. 13, 2020) ("Bolton argues that Bay Valley improperly gave him points under the Policy.  Bay Valley approved his request to attend his aunt's funeral on May 30, 2015, but Bay Valley still gave him a point for missing work on that date . . . If Bay Valley granted Bolton's request for a day off to attend his aunt's funeral on May 30, 2015, and then still gave him a point for that day, a fact that is disputed, this point would be unfair, but Bolton has not shown that it was connected in any way to his alleged disability status.  The fairness of that particular point is in question but has no bearing on a claim for disability discrimination as it does not show that Bay Valley acted with discriminatory animus.  Accordingly, it would not permit a jury to disbelieve Bay Valley's reason for terminating Bolton's employment.").